Commonwealth *v.* DeMoss, Appellant.

Argued May 3, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

reargument refused November 23, 1960.

*Albert S. Oliensis,* with him *Donald J. Goldberg,* for appellant.

*F. Emmett Fitzpatrick,* Second Assistant District Attorney, with him *Domenick Vitullo,* Assistant District Attorney, *Paul M. Chalfin,* First Assistant District Attorney, and *Victor H. Blanc,* District Attorney, for Commonwealth, appellee.

Opinion by Mr. Justice Benjamin R. Jones, October 10, 1960:

At approximately 10 a.m., July 4, 1955, a chambermaid discovered the dead body of Lulubel Rossman, a 76 year old widow, in her room in the Adelphia Hotel, Philadelphia. Mrs. Rossman's death[1] was caused by strangulation at the hands of some unknown person or persons who had bound her arms and legs with two-inch adhesive tape and had gagged her mouth. The appearance of the room—disorder, open pocketbooks and handbags, personal effects strewn about—suggested that a robbery had taken place, although there was no evidence that the room had been forcibly entered.

For this homicide the Commonwealth subsequently indicted and tried, separately, Raymond Wilson, Frank Ellsworth, Robert Thomas and Gus A. DeMoss, the present appellant. Wilson's conviction of murder in the first degree was considered by this Court (*Commonwealth v. Wilson,* 394 Pa. 588, 148 A. 2d 234) and we affirmed his conviction and sentence. In February, 1956, DeMoss was tried in the Court of Oyer and Terminer of Philadelphia County and he was convicted of murder in the first degree and sentenced to

---

[1] The time of death was fixed at approximately 6 p.m. (DST), July 3, 1955.

life imprisonment. From this judgment and sentence DeMoss has appealed.

On this extremely voluminous record with its complicated set of facts DeMoss presents one narrow question: Is the evidence sufficient to sustain his conviction of murder?

DeMoss contends that the Commonwealth failed to show any actual connection on his part with the robbery and homicide and that the only evidence presented by the Commonwealth was that he had been in association, prior to and subsequent to the happening of the robbery and homicide, with the persons who did participate in both crimes. DeMoss argues that, absent any evidence in proof of his actual participation in the robbery and homicide, his conviction cannot be sustained on a theory of "guilt by association".

The Commonwealth's theory is that DeMoss, acting in concert with Thomas, Ellsworth and Wilson, conspired to rob Mrs. Rossman and, in the course of such robbery, Mrs. Rossman met her death at the hands of Ellsworth and Wilson. In determining the sufficiency of the evidence to sustain DeMoss' conviction it is our duty to examine and scrutinize in detail *all* the evidence in this record and to attempt to place in juxtaposition each act, scene and character in this macabre drama. In so doing, we review the evidence and the inferences reasonably arising from such evidence in the light most favorable to the Commonwealth: *Commonwealth v. Scoleri*, 399 Pa. 110, 115, 160 A. 2d 215; *Commonwealth v. Moore*, 398 Pa. 198, 202, 157 A. 2d 65.

Palen Rossman, deceased's husband, at the time of his death on September 7, 1953 left the deceased an estate valued in excess of $400,000. The deceased was eccentric in many respects: among her eccentrici-

ties were a fetish for new $100 bills and a custom of having either upon her person or in her living quarters large sums of money, mostly new $100 bills.

In the spring of 1954, the deceased, vacationing in Florida, became acquainted with a Reverend Ridgeway and his mother, the former then engaged in evangelistic work in Florida and Jamaica. Interested in the Reverend Ridgeway's work, the deceased, over a short period of time, contributed approximately $20,000 toward his personal comfort and ministry. Sometime later, the friendship of the deceased and the Reverend Ridgeway having ended, the deceased claimed that he had taken from her approximately $20,000 and, through a mutual acquaintance, the deceased prevailed upon Paul Huizenga, a Dade County [Miami] deputy sheriff, to investigate her claim against the clergyman. Huizenga and his colleague, Thomas, then a deputy sheriff, after an investigation of the matter became convinced and so advised the deceased that she had no criminal action against the clergyman. However, the deceased persisted in her complaint and, during the early part of 1955, she engaged Huizenga, in a private capacity, to keep the clergyman under surveillance. A short time later Huizenga abandoned his work for deceased and turned her over to Thomas. From that time until the date of her death the deceased and Thomas were in close contact. On various occasions Thomas and the deceased communicated by telephone and, shortly before her death, she posted a $250 money order to Thomas for the services rendered by Thomas and Huizenga.[2]

---

[2] T. A. Hutchings of the Philadelphia office of Western Union Telegraph Company produced records showing that this money order was sent at 12:09 p.m. (EST) on July 1, 1955 and was cashed by Thomas in Miami.

Under the Commonwealth's theory, it was this close association of the deceased and Thomas during the first six or seven months of 1955 which set in motion the chain of events and the interaction of a host of circumstances and characters which led directly to Mrs. Rossman's death. It is the contention of the Commonwealth that Thomas, through his close association with the deceased, learned that she customarily carried about on her person or in her living quarters large sums of money and that Thomas conspired with DeMoss, his former colleague on the Tulsa, Oklahoma, police department, to obtain the aid of two persons with criminal records, Ellsworth and Wilson, to rob the deceased. Wilson's complicity and role in the events which led to the deceased's death and the part played therein by Ellsworth and Wilson are discussed at length in *Commonwealth v. Wilson,* supra. While the Commonwealth concedes that Ellsworth and Wilson actually robbed and killed the deceased, yet it contends that Thomas and DeMoss actively participated in a conspiracy to commit the robbery. It is our task to determine whether there is sufficient evidence of record to justify a finding that DeMoss took part in a conspiracy to rob the deceased.

DeMoss had become acquainted with Wilson in April, 1945 when, as a Tulsa detective, he arrested Wilson in connection with the commission of a burglary. Even though he was the arresting officer, at Wilson's trial DeMoss attested to Wilson's good character and volunteered a recommendation to the trial court that Wilson be paroled in his custody. When this arrest was made, DeMoss was assisted by Thomas with whom he worked on the police force from January 1940 until April 1949, at which time Thomas moved to Miami and found employment as a deputy sheriff. Both DeMoss and Thomas knew Wilson and his criminal inclination.

For almost six years—April 1949 to the early part of 1955—DeMoss and Thomas were virtually strangers. In the early part of 1955—*when Thomas began his close association with the deceased*—suddenly Thomas began to make telephone calls from Miami to the radio dispatcher's room in the Tulsa police department wherein DeMoss worked and almost every Sunday for approximately six months prior to June 4, 1955 Thomas made such calls.[3] DeMoss claimed that these calls were made because Thomas was "lonesome". The renewal of this friendship between Thomas and DeMoss, at the initiative of the former, after the friendship had been dormant for almost six years is highly significant in view of later events.

Sometime prior to June 2, 1955, Thomas went to Tulsa. Thomas had requested his superior officers to be permitted to return a prisoner held in Miami to police authorities in Muskogee, Oklahoma, a departure from the usual procedure which called for the return of a prisoner by the demanding, not the holding, authorities. While in Oklahoma, Thomas visited DeMoss.[4] Upon Thomas' return to Miami, DeMoss on June 24, 1955 telephoned him,[5] allegedly to persuade him to repay $500 which Thomas had borrowed six years previously. It is to be noted that throughout this period both Thomas and DeMoss were deeply in debt.

DeMoss had known Ellsworth for approximately a year but there is no evidence that Thomas had previously known Ellsworth. Ellsworth was involved,

---

[3] Testimony of J. B. Harkins, Tulsa police officer employed in the radio dispatcher's room with DeMoss.

[4] Testimony of H. L. Stege, detective lieutenant of Tulsa police department, who testified he had been told by DeMoss of this visit and had discussed it with him.

[5] Records of Southern Bell Telephone and Telegram Company.

in April, 1954 in the burglary of a Tulsa fur store and, whenever he returned to Tulsa, he was obliged to report to the police. Although his testimony was seriously discredited in this respect, DeMoss advanced two explanations for his association with Ellsworth: that he used Ellsworth, as an informer, and that, in the event DeMoss' superiors were unavailable, Ellsworth was directed to report to him. The record clearly reveals that DeMoss knew Ellsworth, had introduced him to a fellow police officer[6] and had used his unlisted telephone number on May 5, 1955 to call Ellsworth in Omaha, Nebraska.[7] Furthermore, Ellsworth, using the assumed name of "Magee", telephoned DeMoss from a night club in Tampa, Florida, at 3 a.m. (EST) on June 26, 1955, seven days before the homicide.[8] No reason for the latter call was advanced by DeMoss.

Within several hours of this call to DeMoss, Ellsworth, alias "Harry Stokey" and Wilson, alias "Ray Cox", arrived in Miami, driving a 1955 Cadillac automobile bearing an Illinois license plate numbered 1924234, and registered at a motel at 5:30 a.m. (EST) June 26, 1955.[9] While in Miami Ellsworth and Wilson were visited by Thomas.[10] So far as the record indicates, this was the first direct contact between

---

[6] Testimony of Joseph McGuire, chief of the Tulsa police department.

[7] Records of the Southern Bell Telephone and Telegram Company of Tulsa.

[8] Records of the General Telephone Company of Philadelphia.

[9] Records of the Vagabond Motel, 7300 Biscayne Boulevard, Miami Beach, Florida, for June 26, 1955.

[10] Evidence to this effect was given by David Krieger, night manager of the Vagabond Motel, who testified that one "Ray Cox" and one "Harry Stokey" (aliases used by Wilson and Ellsworth, respectively) spent the night of June 26 in that motel. Joseph Woodrow, lifeguard at the motel, testified that he saw Thomas in the company of Ellsworth and Wilson, that he had

Thomas and Wilson. There is no explanation of record for this meeting between Thomas, a police officer, and these two men, each possessing a criminal record, a meeting which took place within 48 hours after DeMoss had called Thomas and within 24 hours after Ellsworth had called DeMoss.

During the time that Ellsworth and Wilson were in Miami, the deceased, with Thomas' knowledge, started by car for Miami on June 26 but, due to a misunderstanding with her chauffeur, she returned to Philadelphia from which city she telephoned to Thomas or another deputy sheriff at 1:12 p.m. on June 28. On July 1 four telephone calls were made between Thomas, his office and the deceased, three of these calls being initiated by the latter. At 11:25 p.m. (DST), July 1 Thomas talked for ten minutes by telephone with the deceased. Two hours later the $250 money order was sent to Thomas. On July 2 deceased twice—10:42 a.m. (DST) and 3:13 p.m. (DST)—tried to reach Thomas and she finally reached him on July 3 at 8:26 a.m. (DST).[11]

From these series of events the Commonwealth argues that Thomas knew that deceased was coming to Miami in the latter part of June and that the robbery of deceased was originally planned to take place in Miami but that deceased's change of plans shifted the scene of the robbery to Philadelphia.

Wilson and Ellsworth are next found in Philadelphia on July 1, 2 and 3, where they are seen by several persons, one of whom testified that Ellsworth and

a conversation with Ellsworth concerning a certain night club, that Ellsworth and Wilson were visited by Thomas, that Woodrow offered Thomas assistance in finding the room of Ellsworth and Wilson but Thomas declined stating that he knew the location of their room.

[11] Records of Southern Bell Telephone and Telegram Company and Bell Telephone Company in Philadelphia.

Wilson attempted to purchase two-inch adhesive tape on July 2, 1955 between 4 p.m. and 5 p.m. (DST).[12]

On July 3, at 1:31 a.m. (DST), Wilson and Ellsworth, using the aliases "Ray Cox" and "Harry Stokey", registered at the Lord De La Warr Hotel near Wilmington, Delaware, approximately thirty-one miles from Philadelphia. The hotel register indicates that their automobile was the same Cadillac which they had had in Miami. At 10:16 a.m. (DST) the same day they checked out of that hotel. On that same date between 9:50 a.m. and 10:08 a.m. (DST) a telephone call was placed from the Dade County sheriff's office to DeMoss in Tulsa.[13]

The trail of Wilson and Ellsworth is next picked up at Washington, D. C. At approximately 2 a.m. (EST) on July 4, Ellsworth, alias "Harry Stokey", boarded a plane for Miami where he arrived at 6 a.m. (EST) and checked into the Columbus Hotel in Miami at 6:43 a.m. (EST) the same day, being given room 1417. At 9:05 a.m. from that hotel room Ellsworth placed a call to Eastern Air Lines for a reservation and later purchased a ticket for Tampa, Florida, on a flight scheduled to leave at 2:25 p.m. (EST) the same day.[14] Ellsworth missed that flight but subse-

---

[12] Evidence to this effect came from the following sources: a bartender at the Torch Bar in Philadelphia identified Wilson as present in that bar on July 1, 1955; a dancer at a Philadelphia night club testified she talked with Wilson in the night club one night during the week prior to July 4, 1955; Helen White, an alleged prostitute, testified that she met and talked to Wilson on the afternoon of July 3, 1955 for approximately twenty to thirty minutes; a clerk in a cigar store identified Ellsworth and Wilson as prospective customers who on July 2, 1955 inquired for two-inch adhesive tape.

[13] Records of the Southern Bell Telephone and Telegram Company.

[14] Records of Eastern Air Lines.

quently secured a flight, aboard National Air Lines, which left Miami at 4:30 p.m. (EST) and arrived in Tampa at 6:04 p.m. (EST) on July 4. *Between 9:27 a.m. and 1 p.m. on July 4, 1955 there were five telephone calls between Ellsworth and/or Thomas in Miami and DeMoss in Tulsa.*[15] DeMoss' explanation of his telephone call to Thomas was that it concerned Thomas' $500 indebtedness to him and DeMoss' plan to go to Miami in search of employment. DeMoss admits that at 10:58 a.m. (EST) on July 4 Thomas sent him a $500 money order. DeMoss' explanation of his call to Ellsworth was that, in one of Thomas' telephone calls that date, Thomas told DeMoss that a man by the name of "Stokey" wanted DeMoss to call him at room 1417 at the Columbus Hotel in Miami, that DeMoss was unable to reach "Stokey" and he later so informed Thomas. A call was later completed to DeMoss from a public telephone at the Columbus Hotel. It is highly significant that at 9:45 a.m. (EST) on July 4—*ten minutes after receipt of the call from the Columbus Hotel and seventeen minutes after Thomas posted the $500 money order*—DeMoss made a reservation for a flight to Tampa. *DeMoss testified that it had been his intention to go to Miami, not Tampa, but that he was unable to secure a reservation to Miami.*

---

[15] Telephone company records indicate the following calls: (a) at 9:27 a.m. from Dade County sheriff's office to Tulsa police department; (b) at 9:40 a.m. collect call from DeMoss to Thomas at the Dade County sheriff's office; (c) at 9:51 a.m. an attempt by DeMoss to reach Ellsworth at the Columbus Hotel, Miami, where Ellsworth was registered as "Stokey" and a transfer and completion of this call to Thomas; (d) at 10:35 a.m. a call placed from a pay phone in the Columbus Hotel lobby to DeMoss' telephone number in Tulsa; (e) at 10:58 a.m. Thomas sent a $500 money order to DeMoss in Tulsa; (f) Ellsworth, using the name "F. J. McGee", made a collect call to DeMoss in Tulsa.

*The airline records indicate that on the plane which DeMoss took to Tampa there were twenty-two vacant seats when the plane left Tampa bound for Miami.*

*Without luggage,* DeMoss flew from Tulsa to Tampa where he arrived at 9:53 p.m. (EST) on July 4.[16] *On that evening Ellsworth and Wilson were together in Club 22, a Tampa night club,*[17] *and, between 10 p.m. and midnight (EST), DeMoss was with them.* A waitress at that club testified that she gave DeMoss two dollars in coins to make a long distance telephone call.[18] The waitress' testimony is corroborated by the fact that from a pay station located in that night club a person named "Moss" telephoned Thomas in Miami at 11:18 p.m. (EST). DeMoss denies that he was present at this night club, that he ever made this telephone call and states that he remained in the Tampa airport from the time of his arrival until the time of his departure for Miami. Accepting as we must the evidence in the light most favorable to the Commonwealth, the record thus places DeMoss, after a cross-country flight, in the company of Ellsworth and Wilson within 28 hours of the robbery and homicide and, while so situated, DeMoss is in communication with Thomas.

At 12:46 a.m. (EST) DeMoss left Tampa and at 1:46 a.m. (EST), July 5, arrived at Miami airport where he was met by Thomas.[19] In Miami DeMoss registered at the Columbus Hotel where he was given room 1417, the same room occupied the day before by Ellsworth. At this hotel DeMoss requested and was given a safe deposit box, presumably for the purpose

---

[16] Records of National Air Lines and Eastern Air Lines.

[17] Testimony of Mrs. E. P. Gutherie, a waitress.

[18] Same.

[19] E. D. Rouls, chief of the criminal division of the Dade County sheriff's office, stated that Thomas later introduced DeMoss to him.

of safeguarding his ring, watch and fraternal pin. While there was evidence to indicate that the rental of a safe deposit box by guests was encouraged in the Miami hotel circuit, it would appear highly unlikely that one would rent a safe deposit box to safeguard articles normally and usually worn about one's person. The record discloses that DeMoss used this safe deposit box twice—once when it was issued to him and again at 10:55 a.m. (EST), five hours later.[20]

From Thomas' home telephone at 7:57 p.m. (EST) on July 5, DeMoss made a reservation for a flight at 1 a.m. (EST) on July 6 from Miami to Tulsa, via Chicago,[21] and DeMoss departed on this flight.

On July 6, 1955, Wilson and Ellsworth, under assumed names, flew from Tampa to Los Angeles and then to Las Vegas, where they were arrested on July 7. In their possession was found approximately $87,000 consisting principally of new $100 bills. The Commonwealth proved, beyond question, that the majority of these bills ran in serial sequence with $100 bills found in the deceased's safe deposit box after her death and were unquestionably bills which had been issued by the Federal Reserve Bank in Philadelphia. The details and the evidence pertaining to this money are covered at length in *Commonwealth v. Wilson,* supra. Thomas, likewise, was shown to have spent some $100 bills which were in serial sequence with those in the possession of Ellsworth and Wilson and in the deceased's deposit box. No currency associated with this robbery was ever found in DeMoss' possession.

DeMoss was charged with and convicted of murder. Where a person enters into a conspiracy with

---

[20] Testimony of Edward Tetzner, the night manager of the Columbus Hotel, who produced the hotel register for July 5 and the record of the safe deposit box rental.

[21] Records of Eastern Air Lines.

other persons to commit a robbery and, in the course of that robbery, a killing takes place, the conspirators are all equally liable for the killing provided that ". . . the killing must have been done by the defendant or by an accomplice . . . or by one acting in furtherance of the felonious undertaking. [citing cases] :" *Com. v. Redline,* 391 Pa. 486, 496, 137 A. 2d 472; *Commonwealth v. Doris,* 287 Pa. 547, 550, 135 A. 313. Even if those who conspire to rob do not plan the death of the victim of the robbery, it is nevertheless murder in the first degree: *Com. v. Sterling,* 314 Pa. 76, 170 A. 258. DeMoss, under the Commonwealth's theory, did not take part in the actual robbery and killing but did conspire with Wilson, Ellsworth and Thomas to commit the robbery in the perpetration of which the killing took place and, thus, became equally culpable with his co-conspirators. DeMoss' culpability arises only if the Commonwealth has proven, beyond a reasonable doubt, that he did enter into a conspiracy to rob the deceased.

In *Com. v. Evans,* 190 Pa. Superior Ct. 179, 201, 154 A. 2d 57, aff'd. per curiam, 399 Pa. 387, 160 A. 2d 407, President Judge RHODES set forth the test to be applied in weighing the sufficiency of evidence to support a charge and conviction of conspiracy: "The evidence was largely circumstantial especially as it related to the conspiracy. The burden was upon the Commonwealth to overcome the presumption of innocence and to establish beyond a reasonable doubt the crimes charged. That the evidence was wholly or largely circumstantial is not fatal if it appears that the evidence is such as reasonably and naturally justifies an inference of guilt of the accused and is of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt. [citing cases]. A convic-

tion will not be allowed to stand if it is based solely upon suspicions and conjectures. Com. v. Clinton, supra, 391 Pa. 212, 218, 137 A. 2d 463. 'Where conviction must be based on circumstantial evidence, as it must here, the theme of guilt must flow from the facts and circumstances proved, and be consistent with them all.' Com. v. Clinton, supra, 391 Pa. 212, 218, 137 A. 2d 463, 466. The Commonwealth, however, is ' ". . . not required to present direct and positive testimony of a collusive agreement to do something unlawful. The nature of the crime attempted usually makes it susceptible of no other proof than by circumstantial evidence . . ." ' Com. v. Musser Forests, Inc., 394 Pa. 205, 211, 146 A. 2d 714, 717.

". . . Consideration should be given to the background of the arrangements made by defendants and their methods of association; where a criminal scheme has numerous actors and shifting scenes of action the conspiracy is often made out by the association of detached facts and by the reasonable inferences deducible therefrom. Evidence of the acts and circumstances in fulfillment of the object of the conspiracy is relevant. [citing cases]. Moreover, 'the actions of the conspirators will be sufficient evidence to prove that a conspiracy exists.' Com. v. Musser Forests, Inc., supra, 394 Pa. 205, 210, 146 A. 2d 714, 716."

DeMoss takes the position that his conviction is based upon evidence which simply proved that he had *associated* with Ellsworth, Wilson and Thomas but did not prove that he had *conspired* with them to rob the deceased. DeMoss relies on certain authorities: *Commonwealth v. Fasci,* 287 Pa. 1, 134 A. 465; *Commonwealth v. Daniele,* 278 Pa. 7, 122 A. 90; *Commonwealth v. Fragassa,* 274 Pa. 1, 122 A. 88 (all three dealing with activities of a "Black Hand Society") ; *Hester v. Commonwealth,* 85 Pa. 139; *McManus v. Commonwealth,*

91 Pa. 57; *Carroll v. Commonwealth,* 84 Pa. 107; *Campbell v. Commonwealth,* 84 Pa. 187 (all four dealing with the "Molly Maguires"). All these authorities hold, in effect, that a conviction of a crime cannot be sustained simply upon proof of association with criminally inclined persons and there must be some proof showing participation in the alleged crime. The establishment of guilt simply by association is not recognized under our law.

The difficulty with DeMoss' position is that the evidence produced by the Commonwealth proved much more than the fact of *association* by DeMoss with those persons responsible for the happening of this crime. The evidence proved that DeMoss was in such relationship with those persons that the only reasonable and logical inference is that he conspired with them for the perpetration of this robbery in the course of which the homicide took place.

Nearly always a conspiracy is subject to proof only by circumstantial evidence and to prove participation in the conspiracy to rob the deceased the Commonwealth necessarily had to depend upon circumstantial evidence. Over a century ago Chief Justice GIBSON in *Commonwealth v. Harman,* 4 Pa. 269, 271, charging a jury in a murder case, stated: "Circumstantial evidence is, in the *abstract,* nearly, though perhaps not altogether, as strong as postive evidence; in the *concrete,* it may be infinitely stronger. A fact positively sworn to by a single eye-witness of blemished character, is not so satisfactorily proved, as is a fact which is the necessary consequence of a chain of other facts sworn to by many witnesses of undoubted credibility".

A reading of this instant record reveals a "fearful concatenation of circumstances".[22] In large measure,

---

[22] Daniel Webster: Argument on the Murder of Captain White (1830).

the Commonwealth's proof is documentary, rather than oral, evidence. Telephone company records, airline records, hotel registers, bank records, serial numbers on currency—all these written instruments were introduced to evidence the fact that Ellsworth, Wilson, Thomas and DeMoss were in close communication with each other at, before or during the time of the happening of this crime. Oral testimony from entirely disinterested persons aided in interpreting, clarifying and enlarging upon this documentary evidence. Through the media of this documentary and oral evidence, inexorably step by step modern methods of crime detection have been able to demonstrate upon this record a series of events which brought together four persons, geographically widely separated, in a conspiracy to rob this elderly woman. The series of contacts established between DeMoss and the three other individuals and the timing and locale of such contacts inescapably bring DeMoss within the circle of guilt and responsibility for this crime. The relationship between Thomas and DeMoss, two police officers, and Ellsworth and Wilson, two persons with criminal records, cannot be explained upon the ground of coincidence; under this evidence a jury could justifiably find that such relationship arose from a calculated plan and continued because of an interdependence among these four individuals that each share a particular part in the task to be accomplished.

One particular phase of this evidence will illustrate the clarity with which DeMoss is connected with this conspiracy. DeMoss wanted to get employment in Miami, according to his testimony, and to this end he left Tulsa, without luggage and on a holiday with reservations made immediately prior to his departure. The evidence shows that minutes before he makes his reservation he has talked with both Thomas and Ells-

worth, both in Miami, and shortly thereafter received $500 from Thomas. Although the evidence clearly shows that he could have secured a reservation directly to Miami on the same plane on which he travelled he went not to Miami, but to Tampa. When he arrived in Tampa, Ellsworth and Wilson, those persons who had robbed and killed the deceased, were in Tampa. While DeMoss says he stayed in the airport for approximately three hours, oral testimony places him in a night club with these two persons whom he had once arrested and documentary evidence shows that he then talked by phone to Thomas. Within a short time he is in Miami with Thomas staying, out of all the hotels in Miami, in the very same room and in the very same hotel in which Ellsworth had stayed when he met with Thomas the day before. All these events take place within 24 hours of the robbery and homicide. Under such a series of events the rental of a safe deposit box at the Miami hotel acquires considerable meaning.

We have carefully examined this entire record, the testimony of each witness and each exhibit of documentary evidence, and we are completely satisfied that the evidence produced by the Commonwealth clearly, indubitably and unquestionably is subject to only one interpretation, to wit, that DeMoss was an active participant in the conspiracy to rob Mrs. Rossman, and for the killing which took place during the commission of that robbery he must share equal culpability with those who actually robbed and killed her. The defendant was fairly and properly tried, no errors on the part of the trial court have been assigned nor found by us in our review of the record, and the evidence was sufficient to prove beyond any reasonable doubt DeMoss' complicity in this homicide.

Judgment and sentence affirmed.

Mr. Justice COHEN dissents.