**UNITED STATES of America ex rel. Gus Alfred DE MOSS**

v.

**COMMONWEALTH OF PENNSYLVANIA, County of Philadelphia, and William J. Banmiller, Warden.**

**Misc. No. 2274.**

United States District Court
E. D. Pennsylvania.

Oct. 13, 1961.

Alan J. Swotes, Philadelphia, Pa., for DeMoss.

James C. Crumlish, Jr., Dist. Atty., F. Emmet Fitzpatrick, Jr., Asst. Dist. Atty., Philadelphia, Pa., for the Commonwealth.

VAN DUSEN, District Judge.

Relator was convicted of murder in the first degree in the Court of Oyer and Terminer, Philadelphia County, Pennsylvania, on October 28, 1958. Motions for a new trial and in arrest of judgment were denied and he was sentenced to life imprisonment on June 1, 1959.[1] The Supreme Court of Pennsylvania affirmed the judgment and sentence. See Commonwealth v. DeMoss, 1960, 401 Pa. 395, 165 A.2d 14. The Supreme Court of the United States denied a petition for a writ of certiorari on February 20, 1961. The relator is presently serving his sentence in the custody of the respondent at the Eastern State Correctional Institution, Philadelphia.

In the instant Petition (Document No. 1), it is contended that the conviction was unconstitutional under the due process clause of the Fourteenth Amendment because the record does not disclose any evidence whatever of relator's guilt.[2] An answer was filed to the Petition (Document No. 5) and a hearing held before the undersigned.

On July 3, 1955, one Mrs. Lulubel Rossman was killed by strangulation in her Philadelphia hotel room, the evidence in the room indicating that the death took place in the course of a robbery. The relator was one of four men indicted for

---

1. The opinion denying the appeal from judgment and sentence is set forth at pp. 1234a–1239a of the Record of the trial, which was presented to the Pennsylvania Supreme Court on Appeal. The Record has been filed as Document No. 7(a), (b) and (c), but the document number will be omitted in this opinion when the page numbers are cited.

2. The petition itself also contends that the conviction was illegal because DeMoss was not within the boundaries of the Commonwealth of Pennsylvania either before or at the time of the crime. This contention was withdrawn at the time of oral argument.

**572**

the murder, each of the four being, according to the Commonwealth's contentions, a conspirator in the robbery which was being pursued at the time of Mrs. Rossman's death. The four alleged conspirators, Raymond Wilson, Frank Ellsworth, Robert Thomas and relator, were tried separately and all were convicted. The Commonwealth did not contend that relator was present at the time of the murder, its theory being that relator and Thomas were the absent two members of a four-man conspiracy to rob Mrs. Rossman, but were responsible for the consequences resulting from said conspiracy—namely, the death of Mrs. Rossman.

■■ The case was presented under the following Pennsylvania legal principles, which have not been challenged in this Petition: A criminal conspiracy is an agreement between two or more persons with criminal intent to do an unlawful act, or to do a lawful act by unlawful means. Commonwealth v. Rosen, 1940, 141 Pa.Super. 272, 279, 14 A.2d 833. If there is a conspiracy to commit a felony and another is killed while the common purpose is being carried out, one who has entered the conspiracy but does not personally commit the wrongful act is as equally responsible for the death as the one directly causing it, the act of one conspirator being considered the act of all. See Commonwealth v. Lowry, 1953, 374 Pa. 594, 599, 600, 98 A.2d 733, certiorari denied 1954, 347 U.S. 914, 74 S.Ct. 479, 98 L.Ed. 1070. The absence of the co-conspirator from the scene of the felony does not affect his responsibility for the consequences thereof. See Nye & Nissen v. United States, 1949, 336 U.S. 613, 618, 69 S.Ct. 766, 93 L.Ed. 919; Pinkerton v. United States, 1946, 328 U.S. 640, 646–8, 66 S.Ct. 1180, 90 L.Ed. 1489.

■■ The proof of the conspiracy involved here rested solely on circumstantial evidence, no direct proof of an express concerted plan among DeMoss and the other three men having been presented by the Commonwealth. Circumstantial evidence is intrinsically no different from testimonial evidence when the jury has been properly instructed on the standards for reasonable doubt. It is well established that the commission of or participation in a crime may be proved by circumstantial evidence. Commonwealth v. Lowry, supra, 374 Pa. at page 600, 98 A.2d at page 733. Relator maintains that because the Commonwealth's evidence was circumstantial, it had to be such as to exclude every reasonable hypothesis other than guilt. This contention was specifically rejected by the Supreme Court of the United States in Holland v. United States, 1954, 348 U.S. 121, 139–140, 75 S.Ct. 127, 99 L.Ed. 150.[3]

Relator contends that he was convicted on the theory of guilt by association, which has been consistently rejected by the courts. See, e. g., Ong Way Jong v. United States, 9 Cir., 1957, 245 F.2d 392, 394–396; Commonwealth v. Fasci, 1926, 287 Pa. 1, 3, 134 A. 465. The Commonwealth agrees that guilt cannot be established by mere association, but contends that the cases relied on by relator to support his view are not applicable here and that the relationship between the alleged conspirators, their conduct, the surrounding circumstances and the overt acts of the other conspirators were legally sufficient to justify submission of the case to the jury and to sustain its finding.[4]

■ Since the jury determined that the relator was guilty as charged, any conflicting evidence must be viewed in the light most favorable to the Common-

3. See, also, Wood v. United States, 5 Cir., 1961, 287 F.2d 810; United States v. Giuliano, 3 Cir., 1959, 263 F.2d 582, 584.

4. The trial judge was clear and correct in stating in his charge that, in order to find DeMoss guilty, the jury had to find that he was a member of a criminal conspiracy and that one or more of his co-conspirators killed Mrs. Rossman (Record, pp. 1095a–1096a). He could only be found culpable if the Commonwealth had proved beyond reasonable doubt that he (DeMoss) had entered into a conspiracy to rob the deceased and that a co-conspirator killed Mrs. Rossman in the pursuit of the common plan, i. e., the robbery. See Commonwealth v. Minnich, 1915, 250 Pa. 363, 95 A. 565. A correct charge on these legal points was given to the jury.

wealth. Evans v. United States, 9 Cir., 1958, 257 F.2d 121, 123. The entire record of the trial of this case has been thoroughly considered and the evidence of particular significance for the purpose of deciding the instant Petition includes the following testimony:

█ DeMoss and Thomas, while working for the Tulsa police department, became acquainted with Raymond Wilson. Both knew of his criminal record.[5] DeMoss knew Frank Ellsworth (p. 176a, p. 1222a), who had been convicted of burglary (pp. 881a–882a). Thomas left the Tulsa police department in 1949 and became a member of the Dade County, Florida, Sheriff's office (pp. 169a, 210a). He did not contact DeMoss, who was reassigned from detective to radio dispatcher in 1953 (p. 183a), until about the beginning of 1955, when he began calling the radio dispatcher's room of the Tulsa police department on the direct line (pp. 641a–642a, 650a–653a). It was in January 1955 that Mrs. Rossman, a rich eccentric widow who was known to carry cash on her person (pp. 276a–278a, 281a–282a, 295a–296a, 301a–302a), engaged Thomas to investigate an alleged swindle, visited him in Miami, and thereafter frequently communicated with him (pp. 195a–197a).

On May 5, 1955, a telephone call was made from DeMoss to Ellsworth on DeMoss' "non-published" phone (p. 519a). In June 1955, Thomas visited Tulsa[6] and DeMoss saw him while he was there (p. 181a). At about the same time, Ellsworth visited the radio dispatcher's room of the Tulsa police department and was introduced to others present there by DeMoss (p. 186a). On June 24, 1955, DeMoss talked to Thomas after having tried unsuccessfully to call one "Stockey" in Miami. Later that day DeMoss was called by one "McG * * *"[7] and, thereafter, DeMoss made another call to Thomas (pp. 524a–527a). "Stockey" was the name used by Wilson when he registered at the Vagabond Motel in Miami on June 26, 1955 (pp. 247a–249a).

On June 26, 1955, a call was made from "Magee", then at the public phone in the Club 22, Tampa, Florida, to the Tulsa police department radio dispatcher's room (pp. 457a–458a).[7] Several hours after this call to Tulsa, Ellsworth and Wilson arrived in Miami and were visited by Thomas (pp. 244a–254a). It was planned by Mrs. Rossman that she leave Philadelphia late in June 1955 and go to Florida to live permanently, but she changed her mind en route and returned to Philadelphia (pp. 304a–306a).[8]

Mrs. Rossman planned to leave Philadelphia for Connecticut in July 1955 and deposit her money in a bank in Connecticut (pp. 282a–284a). She cancelled these plans on the morning of July 3, at which time she feared for her safety (pp. 283a–289a). She spoke to Thomas by phone several times on July 1 and once on July 3 (pp. 440a–444a, 505a). She was murdered in her hotel room on July 3. Her mouth, hands and feet were bound with two-inch adhesive tape (pp. 58a, 59a, 91a).

Wilson was seen in Philadelphia by various witnesses on July 1, 2 and 3 (pp. 326a–330a, 349a, 359a–364a) and Wilson and Ellsworth were both seen in Philadelphia on July 2 when they made in-

---

5. DeMoss arrested Wilson as a burglary suspect in 1945 and DeMoss and Thomas arrested him for FBI investigation in 1947 and as a burglary suspect in 1948 (Record, pp. 170a and 174a). Note that there is an error in the order in which the pages appear in the Record (Document No. 7) and that the following represents correction thereof: p. 176a should follow p. 170a; p. 177a should follow p. 173a; p. 171a shoud follow p. 176a.

6. Thomas obtained permission to bring a prisoner from Dade County, Florida, to Muskogee, Oklahoma. This was a very unusual procedure according to the Chief of the Criminal Division of the Dade County Sheriff's Department (p. 198a).

7. "Magee" was a fictitious name used by Ellsworth at times (p. 955a).

8. From this group of events, the Commonwealth contends that the original plan of the conspirators was to rob Mrs. Rossman in Miami, but that this plan had to be changed when she decided not to go to Florida.

quiries about buying two-inch adhesive tape (pp. 349a–351a). They were registered, under aliases, in a Delaware hotel from 1:31 a. m. to 10:16 a. m. on July 3. Between 9:50 a. m. and 10:03 a. m., a telephone call was placed from the Dade County Sheriff's office to DeMoss in Tulsa (p. 506a).

On July 4, at 6:43 a. m., Ellsworth checked into the Columbus Hotel in Miami. He made a reservation from the hotel to fly to Tampa, did so, and arrived there at 6:04 p. m. Between 9:27 a. m. and 1 p. m. on July 4, 1955, there were five telephone calls between Ellsworth and/or Thomas in Miami and DeMoss in Tulsa.[9]

DeMoss, who did not work July 4–6 (p. 177a), made reservations to fly to Tampa shortly after receiving a call from Ellsworth at the Columbus Hotel (pp. 581a, 598a, 955a–956a). He was seen in the Club 22, Tampa, that evening between 10 p. m. and midnight in the company of Wilson and Ellsworth (pp. 478a–480a) and received change from the barmaid at the Club to make a telephone call (p. 480a). One "Moss" called Thomas from the Club 22 at 11:18 p. m. that evening (pp. 454a, 460a). DeMoss made a telephone reservation to go from Tampa to Miami via Eastern Airlines (p. 1017a), left Tampa in the early hours of July 5, and arrived in Miami at 1:46 a. m. (p. 615a). He checked into the Columbus Hotel at 6:05 a. m. and stayed in the same room that Ellsworth had been using the previous day. While there, he hired a safe deposit box in the hotel and also

is known to have called his daughter in Texas (pp. 511a, 558–9a). Sometime prior to noon on that day, he was seen in the company of Thomas in the Miami airport (p. 213a). At 7:57 p. m., DeMoss made a reservation from Thomas' home phone for a flight to Chicago and also requested space on a flight from Chicago to Tulsa (pp. 498a, 621a–622a). At 12:58 a. m., July 6, DeMoss checked out of the Columbus Hotel (p. 559a).

There was evidence presented from which the jury could have found that DeMoss' financial position improved after his return from Florida. He stated to an acquaintance in July 1955 that he had saved $1,500 and showed him three $500 cashier's checks (p. 1047a). He also took trips to Hot Springs, Arkansas, and Las Vegas, Nevada, after his return (pp. 983a, 984a).[10] Later that year he traded in his diamond ring for a new one (p. 981a). Even if the undersigned would not have been persuaded that his financial position had improved in light of other evidence concerning loans taken by him after July 6, 1955 (pp. 798a–804a), the jury had evidence before it from which it could have made such a finding.

■ The above evidence, which is only part of that submitted to the jury, shows more than mere association between DeMoss and the principal actor or actors in the robbery-murder. Conspiracy may be inferentially established by showing the relation, conduct or circumstances of the parties and the overt acts of the co-conspirators. Where the acts of the parties indicate that they were acting in concert

9. The Pennsylvania Supreme Court thought these calls particularly significant and set them forth succinctly as footnote 15, 401 Pa. at page 405, 165 A.2d at page 19, in their opinion concerning this case, Commonwealth v. DeMoss, supra:
"Telephone company records indicate the following calls: (a) at 9:27 A.M. from Dade County sheriff's office to Tulsa police department; (b) at 9:40 A.M. collect call from DeMoss to Thomas at the Dade County sheriff's office; (c) at 9:51 A.M. an attempt by DeMoss to reach Ellsworth at the Columbus Hotel, Miami, where Ellsworth was registered as 'Stokey' and a transfer and completion of this call to Thomas; (d) at 10:35 A.M. a call placed from a pay phone in the Columbus Hotel lobby to DeMoss' telephone number in Tulsa; (e) at 10:58 A.M. Thomas sent a $500 money order to DeMoss in Tulsa; (f) Ellsworth, using the name 'F. J. McGee,' made a collect call to DeMoss in Tulsa."

10. His visits to these cities where gambling takes place might have been considered by the jury not only as further evidence of betterment of his financial position but also as suspicious trips which were connected with the conspiracy and which were taken in order for DeMoss to fence his share of the stolen money.

to a common end, it is permissible for the jury to infer that the concerted action was the result of an unlawful agreement. Commonwealth v. Rosen, supra, 141 Pa. Super. at page 276, 14 A.2d 833.

There was evidence presented here from which the jury could justifiably have found that the relationship between the two police department members and the two criminals arose from a calculated plan to rob Mrs. Rossman. There was also evidence from which the jury could have determined that one of the conspirators, Wilson, killed Mrs. Rossman in the course of carrying out the object of the conspiracy.[11] There was some evidence in the record from which the jury could have found that DeMoss was a co-conspirator in a criminal conspiracy to rob Mrs. Rossman and that a fellow conspirator killed her in pursuance of that felonious plot.

### Order

And Now, October 13, 1961, after consideration of the foregoing Petition, the briefs of counsel (Documents Nos. 8 and 9), the letter of September 19, 1961, which has been attached to relator's brief, oral argument, and the record, It Is Ordered that the Petition for Writ of Habeas Corpus (Document No. 1) is Dismissed.

11. The relator objects to the introduction of Wilson's record of conviction for Mrs. Rossman's murder during his trial as proof of Wilson's guilt. This objection was raised at the trial, was overruled by the trial judge (p. 738a), and the record was admitted into evidence (p. 739a). It does not appear that this point was submitted to the Pennsylvania Supreme Court at the time of relator's appeal, although it was raised as an additional reason for a new trial (p. 1233a). Not having been submitted to the Pennsylvania appellate court, it is doubtful that relator can properly raise this point in this Petition under 28 U.S.C.A. § 2254. See attached letter of September 22, 1961. However, even if the issue were properly before this court, the following Pennsylvania procedure is not a violation of due process of law (cf. United States ex rel. Thompson v. Price, 3 Cir., 1958, 258 F.2d 918:

When one is charged as an accessory, the Commonwealth's burden is to establish the guilt of the principal as if the principal himself were being tried. An approved mode of accomplishing this in Pennsylvania is to produce and offer the record of the principal's conviction and judgment of sentence. Commonwealth v. Minnich, 1915, 250 Pa. 363, 366–368, 95 A. 565. See Goldberg v. United States, 5 Cir., 1924, 297 F. 98, 101; Commonwealth v. Parmer, 1950, 364 Pa. 11, 14, 70 A.2d 296.

Because the guilt of the principal must be established before a co-conspirator can be held responsible for the crime, the Commonwealth's evidence concerning the activities of the other conspirators, including the principal or principals, was relevant to the case against DeMoss. Relator's argument, therefore, that most of the evidence did not concern him is neither sound nor persuasive.