UNITED STATES of America ex rel. Gus Alfred DeMOSS, Appellant,

v.

COMMONWEALTH OF PENNSYLVANIA, County of Philadelphia and William J. Banmiller, Warden.

No. 13874.

United States Court of Appeals Third Circuit.

Argued April 6, 1962.

Reargued Nov. 20, 1962.

Decided April 24, 1963.

Rehearing Denied May 16, 1963.

842

Alan J. Swotes, Philadelphia, Pa., for appellant.

Arlen Specter, Asst. Dist. Atty., Chief, Appeals Division, Burton Satzberg, Asst. Dist. Atty., Paul M. Chalfin, First Asst. Dist. Atty., James C. Crumlish, Jr., Dist. Atty., Philadelphia, Pa., for appellee.

Before BIGGS, Chief Judge, McLAUGHLIN, Circuit Judge, and SHERIDAN, District Judge.

McLAUGHLIN, Circuit Judge.

This is an appeal from the refusal of the district court to grant appellant's petition for a writ of habeas corpus.

Appellant, DeMoss, was convicted of murder in the first degree in the Court of Quarter Sessions in Philadelphia County, Pennsylvania and sentenced to life imprisonment. The Pennsylvania Supreme Court, Commonwealth v. DeMoss, 401 Pa. 395, 165 A.2d 14 (1960) affirmed and certiorari was denied by the United States Supreme Court, 365 U.S. 822, 81 S.Ct. 708, 5 L.Ed.2d 701 (1961). Appellant then filed a petition for a writ of habeas corpus in the United States District Court alleging that (1) the conviction was illegal since he was not within the boundaries of the Commonwealth either before or at the time of the crime and (2) the conviction was violative of due process in that the record disclosed no evidence of guilt. The first contention was withdrawn at the time of oral argument[1] and the petition, based only on the second ground, was dismissed, 198 F.Supp. 570 (E.D.Pa.1961).

The sole question before us is whether this appeal is within the rule of Thompson v. Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960) and Garner v. Louisiana, 368 U.S. 157, 82 S. Ct. 248, 7 L.Ed.2d 207 (1961). The Court held in those opinions that it is a denial of due process for a state to

1. This jurisdictional issue was not raised by DeMoss in the state courts and, therefore, could not properly be before us for review. Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953). The question, however, while not briefed, was explored by this court at oral argument. Since that time the Pennsylvania Supreme Court in a companion case, Commonwealth v. Thomas, 410 Pa. 160, 189 A.2d 255, has decided this precise question adversely to appellant. It found that "When this conspiracy was formed its purpose was to effect a robbery in Pennsylvania. * * * [I]n this conspiracy Thomas [DeMoss] played a principal role and the act of robbery committed by Wilson and Ellsworth in Pennsylvania, in the course of which deceased met her death, was a natural and probable consequence of the conspiracy." The court held that "For the acts committed by his co-conspirators Thomas [DeMoss] is legally liable and, even though not present when the contemplated acts took place, Thomas [DeMoss] must assume the responsibility for the consequences of the conspiracy and the acts of his co-conspirators. * * * Pennsylvania, where the conspiracy took effect, clearly had jurisdiction to try Thomas [DeMoss]." We are in accord with that view.

convict someone upon no evidence of guilt. The Court, however, was careful to point out that "[d]ecision of this question turns not on the sufficiency of the evidence, but on whether this conviction rests upon any evidence at all." Thompson v. Louisville, supra at 199, 80 S.Ct. at 625. Thus, the pivotal point of our inquiry is whether the conviction of DeMoss rests upon "any evidence" which would support the finding that he committed the crime charged.[2] Garner v. Louisiana, supra at 163—164, 82 S.Ct. at 251–52.

Without need of refinement upon the etymology of the word "any", it is enough that we find some evidence of "whatever * * * quantity"[3] on all the essential elements of the charge.[4] This must, of necessity, follow from the Court's admonishment to refrain from questioning the sufficiency of the proofs.

■ This case arises out of the Philadelphia murder of Lulubel Rossman on the evening of July 3, 1955. Mrs. Rossman, an elderly and eccentric widow who carried large quantities of money in new $100 bills, was killed by strangulation. The appearance of the room suggested that her death took place in the course of a robbery. DeMoss, Raymond Wilson, Frank Ellsworth and Robert Thomas were indicted for her murder by the Commonwealth, tried separately and each convicted. The Commonwealth's theory is that these four men conspired with each other to rob Mrs. Rossman: Thomas, a law enforcement officer in Miami, Florida, and DeMoss, a Tulsa, Oklahoma police officer, were absent members of the conspiracy; Ellsworth and Wilson were the men who actually committed the robbery, in the course of which Mrs. Rossman was killed.

Appellant's sole argument for reversal is that there is no evidence connecting him with the conspiracy: all the evidence shows is his association with others who may have committed the crime charged. We cannot agree.

DeMoss' acquaintance with Wilson dated back to occasions in 1945, 1947 and 1948 when he arrested Wilson in Tulsa. At the trial following the 1948 arrest DeMoss attested to Wilson's good character and recommended that he be paroled to him. DeMoss also indicated at this hearing that he had known Wilson for some time. He was assisted in the 1947 and 1948 arrests by Thomas, who at that time was also a member of the Tulsa police force. Thomas was on the force with DeMoss from January 1941 until April 1949, when he left Tulsa, moved to Florida and found work in the Dade County Sheriff's Department. In his last two years on the Tulsa police force he and DeMoss worked as partners. DeMoss' relationship with Ellsworth grew out of the latter's arrest on suspicion of burglary in April 1954. Ellsworth was released on bond but was required to report to the Tulsa police department whenever he returned to that city. For whatever reason, it is clear that DeMoss had frequent contact with Ellsworth from the time of his Tulsa arrest in 1954 until July 1955: he introduced him to a fellow police officer in the county detectives headquarters; Ellsworth called DeMoss at the latter's non-published home telephone number two months before the homicide; and DeMoss was in telephone contact with

---

2. The focus here must be kept separate from that in the so-called "tainted" evidence cases. E. g., Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942).

3. 1 Bouv.Law Dict. 205 (Rawle's 3d rev. 1914); Funk & Wagnalls, New Stand. Dict. 127 (rev. ed. 1942).

4. But cf. Player v. Steiner, 292 F.2d 1, 2 (4 Cir. 1961) in which the court says:

"an absence of evidence proving one of the elements of a crime which is made up of several elements is not the same as a conviction on absolutely no evidence at all [and does not bring the case within the rule of Thompson and Garner]." This appears contrary to the sense and analysis of Garner v. Louisiana, supra. at 165–169, 82 S.Ct. at 252–255; and see Tot v. United States, 319 U.S. 463, 473, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943) (concurring opinion).

Ellsworth just seven days before the crime was committed.

Although establishing the relationship of DeMoss to all three co-conspirators, the primary thrust of the Commonwealth's proof was directed to the close relationship between DeMoss and Thomas in the months immediately preceding the death of Mrs. Rossman.

Thomas had been employed by Mrs. Rossman to do private investigation work for her in Florida. As a result, he was in constant contact with the deceased in the six or seven months prior to her murder; she visited him in Florida and frequently called him from Philadelphia. At the same time that Thomas began his association with the deceased he renewed his old tie-up with DeMoss, which had lain dormant in the six years since he had left Tulsa. Every Sunday, for about six months, Thomas called DeMoss at his position in the radio dispatchers' room in the Tulsa police department. Then in early June of 1955, Thomas, at his own request, returned a prisoner wanted by the Oklahoma authorities to Muskogee, Oklahoma. There was testimony by his commanding officer that this was a "very unusual" request, for normally the demanding state comes for the prisoner. While in Oklahoma Thomas visited DeMoss. Approximately two weeks after his return to Miami, DeMoss called Thomas. DeMoss' alleged purpose in calling was to persuade Thomas to repay $500 that he had borrowed in 1949. The story was, that although DeMoss had never loaned Thomas more than $5 at a time before, he loaned him $500 in 1949 when Thomas was about to leave Tulsa and was in financial trouble. It is interesting to note that in the 1953–1955 period alone DeMoss had borrowed over $1800 from lending institutions before he thought to ask Thomas for repayment of the alleged $500 loan.

Two days later, on June 26, 1955, Ellsworth, using an alias, called DeMoss from a Tampa night club. That same day he and Wilson, driving a 1955 Cadillac with Illinois license plates, arrived in Miami and were visited by Thomas at their motel. That same day, June 26, Mrs. Rossman was leaving Philadelphia to visit Thomas in Miami. Due to a misunderstanding with her chauffeur she was forced to cancel her trip and return to her Philadelphia hotel. Then followed several telephone calls between Thomas and the deceased, starting with a call from her on the afternoon of June 28 and ending with an 8:26 A.M.[5] call on July 3, the day of her death.

Although Ellsworth and Wilson had a meeting with Thomas on June 26 in Miami and Ellsworth had called DeMoss from Tampa on the 24th, they were next seen in Philadelphia on July 1 and 2 by several witnesses, one of whom testified that they attempted to purchase two-inch adhesive tape from him. They stayed together, using assumed names, at the same hotel outside Philadelphia on July 3, having registered at 1:31 A.M. and checked out at 10:16 A.M. Later that day the deceased was murdered in her hotel room and when found was bound with two-inch adhesive tape. At 11:00 P.M. the same night Ellsworth was seen in the restaurant at the Washington, D. C. airport, and again a few hours later when he boarded a plane bound for Miami. He checked into a Miami hotel at 6:43 A.M. on July 4. Soon thereafter he apparently got in touch with Thomas, for at 9:42 A.M. Thomas called DeMoss in Tulsa and told him that he was to call one "Stokey" at the Columbus Hotel who had been trying to get in touch with him. Although Thomas knew that "Stokey" was Ellsworth, DeMoss testified that it was not until later that he learned that this was an assumed name used by Ellsworth. Nonetheless, without knowing any more about who "Stokey" was, DeMoss placed a call to this name at 9:45 A.M. The hotel said that they had no such party registered there, so DeMoss had his call transferred to Thomas at the sheriff's office. At 10:35 A.M. Thomas called DeMoss in Tulsa

5. All times are Eastern Standard Time.

again and within ten minutes of this call DeMoss was making airplane reservations for a flight to Tampa.

Meanwhile in Miami, Thomas sent off a $500 money order to DeMoss. The next known contact with his co-conspirators was a 12:14 P.M. collect call from Ellsworth (using another alias), in Miami to DeMoss' non-published home 'phone. DeMoss accepted the call even though he says that he did not know who the party calling was, since at that time allegedly he was also unfamiliar with this second assumed name of Ellsworth. Shortly after this telephone conversation DeMoss left for his flight to Tampa. According to his story he was going to Miami because he had never been there and he "wanted to see Florida." DeMoss also said he went there to get a job and had been told by Thomas, who was helping him in this endeavor, to "come down there and make application [at the Fountainbleu Hotel] and he would see I got a job there, and if not there, they were building several new hotels." Unfortunately, when DeMoss arrived in Miami he was not able to apply anywhere "because it was a holiday and we could not find anybody." It is significant that DeMoss' flight was to Tampa and not Miami where he supposedly intended to go to see about future employment. He says that he could not secure a flight straight through to Miami, but the airline records indicate that there were almost two dozen vacancies on his flight's continuation to Miami. Furthermore, despite the fact that he planned to stay two days, DeMoss travelled without luggage. Of even more importance is the fact that DeMoss was seen with Wilson and Ellsworth that night between 10:00 P.M. and midnight in a Tampa night club. A waitress testified that she gave him change so he could make a telephone call and the record shows that at 11:18 P.M. Thomas was called by a "Moss" from this night club.

Shortly after midnight DeMoss took a flight from Tampa which arrived in Miami at 1:46 A.M. the morning of July 5. He was met at the airport by Thomas and they drove around, stopped to eat and finally DeMoss checked into the Columbus Hotel at 6:05 A.M. He was given the same room that Ellsworth had occupied the day before. While there he rented and used a safe deposit box for the alleged purpose of safeguarding his ring, watch and fraternity pin. To this the state supreme court commented: "While there was evidence to indicate that the rental of a safe deposit box by guests was encouraged in the Miami hotel circuit, it would appear highly unlikely that one would rent a safe deposit box to safeguard articles normally and usually worn about one's person." Commonwealth v. DeMoss, supra at 407, 165 A.2d at 20. DeMoss made reservations for a flight to Tulsa from Thomas' house that evening and checked out of his hotel later that night. The next day, July 7, Wilson and Ellsworth were apprehended in Las Vegas with large quantities of new $100 bills in their possession, thus precipitating the subsequent investigation and arrests.

Although the Commonwealth never found any of the currency taken in the robbery in DeMoss' possession, there was evidence from which the jury could find that his financial picture had brightened considerably after his return from Florida.

This brief summary of the record in itself convincingly indicates that there was some evidence to support DeMoss' conviction. And the more closely the entire trial record is examined, the more the complete validity of that statement becomes apparent. There was evidence from which the jury could find that Thomas contacted DeMoss and that together they planned and arranged the proposed robbery. Their prior working relationship in Tulsa, the six year hiatus in this relationship and its sudden blossoming at the same time that Thomas was engaged by Mrs. Rossman and became acquainted with her monetary habits are just a few of the factors which point in that direction. Further, there is evidence which supports the

Commonwealth's theory that DeMoss procured Ellsworth and Wilson (both known to him as criminals) to commit the robbery and that Wilson did in fact kill Mrs. Rossman in the course of carrying out their common purpose.

■ The fact that the Commonwealth proved no overt act of conspiracy is not fatal to its case for, by the very secret nature of the crime, most conspiracy convictions rest on inferences from circumstantial evidence, as is the situation here. Admittedly, there is a fine line between a record which reveals some evidence connecting a defendant with the conspiracy and one which shows only association with others who may be guilty of a criminal conspiracy. We are satisfied, however, that the complex of relationships which DeMoss established and the timing of his activities immediately prior to and after the murder show more than a mere association. Our burden being no heavier, we need go no further.

The judgment of the district court will be affirmed. Chief Judge BIGGS concurs in the result reached.