Commonwealth *v.* Stukes, Appellant.

536

Argued April 23, 1969. Before Bell, C. J., Jones, Cohen, Eagen, O'Brien, Roberts and Pomeroy, JJ.

*James E. Beasley,* with him *Kip D. Denega,* and *Beasley, Albert, Hewson & Casey,* for appellant.

*Benjamin H. Levintow,* Assistant District Attorney, with him *Roger F. Cox* and *James D. Crawford,* Assistant District Attorneys, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, October 9, 1969:

The appellant, James A. Stukes, was convicted by a jury in Philadelphia County of murder in the first degree, and the punishment was fixed at life imprisonment. Motions in arrest of judgment and/or a new trial were denied and sentence was imposed as the jury directed. From the judgment of sentence, this appeal was filed. We affirm.

## Motion In Arrest of Judgment

Stukes challenges the sufficiency of the trial evidence to sustain his conviction. In evaluating the correctness of this position, all of the evidence must be read in a light most favorable to the Commonwealth and it is entitled to all of the reasonable inferences arising therefrom. *Commonwealth v. Tabb,* 417 Pa. 13, 207 A. 2d 884 (1965), and *Commonwealth v. De-Moss,* 401 Pa. 395, 165 A. 2d 14 (1960). Read in this light, the record amply supports the guilty verdict.

From the evidence the jury could find the following:

During the early morning hours of April 3, 1966, John Burgess, Ronald J. Dessus and Stukes unlawfully entered a home in Southwest Philadelphia occupied by Lena Alexandroff, 78 years of age; her daughter, Nat-

alie Tuchar, 44 years of age; and Mrs. Tuchar's daughter, Paula, 14 years of age; all three females were brutally beaten and robbed of personal belongings by the intruders. All three were also raped. From the injuries received, Mrs. Alexandroff died nineteen days later.

While the evidence does not establish that Stukes directly participated in the robbing, beating or sexual assault of Mrs. Alexandroff,[1] it was sufficient to prove that he raped Mrs. Tuchar and also sufficient to justify the conclusion that he was part and parcel of the entire unlawful occurrence, i.e., that the entire occurrence was a concerted act. The jury could, therefore, properly resolve that Stukes was at least guilty of aiding and abetting in the rape and killing of Mrs. Alexandroff and was equally guilty with those who actually inflicted the injuries which caused her death. See *Commonwealth v. Coyle*, 415 Pa. 379, 203 A. 2d 782 (1964), and *Commonwealth v. Lowry*, 374 Pa. 594, 98 A. 2d 733 (1953).

### Motion For A New Trial

Several alleged errors during the proceedings in the court below are asserted in support of the argument that a new trial should be ordered. We have carefully examined each assignment of error in connection with the record and find no error which would warrant a retrial.

For instance, Stukes argues that he was denied the representation of counsel at a critical stage in the proceedings in violation of his rights under the Sixth Amendment of the United States Constitution. The pertinent record facts are as follows:

Stukes was arrested on April 3, 1966. Able counsel was appointed to represent him on April 28th. His

---

[1] According to the testimony, it was Burgess and Dessus who raped and inflicted the fatal injuries upon Mrs. Alexandroff.

trial, i.e., the voir dire examination and the selection of jurors, began on June 6, 1967.

Pursuant to an order entered on May 5, 1967, by the Honorable Vincent A. Carroll, President Judge of the Philadelphia Courts, Stukes was examined on May 19th by two psychiatrists and a psychologist to determine if he was competent to stand trial. Such an examination was requested by Edward A. Guy, M.D., Director of the Division of Psychiatry of the Philadelphia prisons. Neither the district attorney nor defense counsel were notified of the petition or of the court's order and neither were present during the examination.[2] During the examination, no questions were asked pertaining to the alleged offense and Stukes was cautioned not to volunteer any such information. As a result of the examination, the examining physicians concluded that Stukes was "able to cooperate with counsel and to understand the nature of the proceedings against him."

The question of Stukes' competency to stand trial first arose in Dr. Guy's mind following an examination that he made of him on April 24, 1967, during which the Doctor found Stukes "acutely agitated and fearful." He prescribed that Stukes be given thorazine, a major tranquilizer which affects the central nervous system. The use of this drug was discontinued on April 28th, upon which date Stukes was given one dose of cogentin

---

[2] Defense counsel first learned of Stukes' examination and the report of the examining physicians on June 14, 1967. Immediate motions were filed: (a) to continue the trial pending examination of Stukes by an independent psychiatrist; (b) to dismiss the indictment; (c) for his release on bail. The trial court denied these motions but conducted a hearing in the absence of the jury where all counsel were present and given the opportunity to question the examining physicians as to the details and results of the examination and the type and quantity of drugs administered to Stukes during his confinement.

to combat drowsiness, one of the side effects of thorazine. From April 28th until June 13th, Stukes was given three 10-milligram doses of librium each day and thereafter the dosage was reduced to a simple 10-milligram quantity of librium each day, given prior to bedtime.

It cannot be questioned that Stukes was entitled to the assistance of counsel during the psychiatric examination conducted on May 19, 1967, if such constituted a "critical stage" in the criminal proceedings pending against him. *White v. Maryland,* 373 U.S. 59, 83 S. Ct. 1050 (1963) ; *Hamilton v. Alabama,* 368 U.S. 52, 82 S. Ct. 157 (1961) ; *Commonwealth ex rel. O'Lock v. Rundle,* 415 Pa. 515, 204 A. 2d 439 (1964) ; and *Commonwealth v. Phillips,* 208 Pa. Superior Ct. 121, 220 A. 2d 345 (1966), aff'd 424 Pa. 641, 226 A. 2d 863 (1967), cert. denied 387 U.S. 946, 87 S. Ct. 2084 (1967). However, in our view, the psychiatric examination was definitely not a "critical stage" in the criminal proceedings mandating the presence and assistance of counsel under the Sixth Amendment of the United States Constitution.

A "critical stage" in criminal proceedings exists in situations where legal rights may be preserved or lost, or where some factual or legal disadvantage may be suffered by the accused. See *Commonwealth ex rel. O'Lock v. Rundle,* supra; *Commonwealth ex rel. Butler v. Rundle,* 416 Pa 321., 206 A. 2d 283 (1965) ; and *Commonwealth v. Phillips,* supra. The examination here involved was not such a situation.

Stukes' examination was conducted as a precautionary measure to insure due process. The findings emanating from the examination were not brought to the attention of the trial jury nor were they ever intended for trial use. The prosecution had no part in the conduct of the examination or in its initiation; indeed, neither the prosecutor nor the defense were apprized

of it until June 14, 1967. Moreover, and most significantly, Stukes had nothing to lose as a result of the examination but everything to gain. It was mainly for his protection and to insure a fair trial. In *United States v. Wade,* 388 U.S. 218, 87 S. Ct. 1926 (1967), wherein the Court ruled that "systematized or scientific analyzing of the accused's fingerprints, blood sample, clothing, hair, and the like" were not "critical stages at which the accused has the right to the presence of his counsel", the Court further said: "Knowledge of the techniques of science and technology is sufficiently available, and the variables in techniques few enough, that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts. The denial of a right to have his counsel present at such analyses does not therefore violate the Sixth Amendment; they are not critical stages since there is minimal risk that his counsel's absence at such stages might derogate from his right to a fair trial."[3]

In connection with the foregoing, Stukes also argues that there was a purposeful disregard of Rules 304, 305, 306 and 307 of the Pennsylvania Rules of Criminal Procedure by the court in that notice of the court order authorizing Stukes' psychiatric examination was never given to his counsel. It must, however, be remembered that it was not the district attorney who applied to the court for Stukes' psychiatric examination. Rather it was Dr. Guy, the prison psychiatrist,

---

[3] See also, *United States ex rel. Wax v. Pate,* 409 F. 2d 498 (7th Cir. 1969), wherein the court ruled that a pre-trial psychiatric examination requested by the prosecution and conducted by a physician, designated by the prosecution for the purpose of testifying at trial, is not, in the absence of a showing of prejudice, a "critical stage" requiring the presence of defense counsel.

who made the application. In our view, the Rules of Criminal Procedure cited by Stukes have no bearing under these circumstances.

Stukes also complains that his constitutional rights were violated at the hearing before the trial court on June 14th with regard to the tests and treatment given him during his confinement, in that the court precluded his counsel from pursuing detailed cross-examination into the qualifications of the examining psychiatrists, and restricted his counsel's examination of the medical file to those portions of it which related to the question of Stukes' competency to stand trial. The expert witnesses were permitted to give their basic qualifications, however. Inasmuch as Stukes has not shown how the court's restrictions have prejudiced him, we find no merit in these arguments.

Stukes further argues that he was not mentally present at his trial because he was forced to stand trial while under the influence of drugs. If that were the case, there is no question but that a new trial would be required. *Alexander v. United States*, 290 F. 2d 252 (1961); *Pledger v. United States*, 272 F. 2d 69 (1959); *State v. Murphy*, 56 Wash. 2d 761, 355 P. 2d 323 (1960). However, there is no evidence in the record that Stukes was at all influenced by drugs at his trial. Major tranquilizers were given to Stukes for the span of three days, from April 26 to April 28, 1967. Thereafter librium, a minor tranquilizer which has no general depressing effect on the mind, but merely relieves anxiety, was given to Stukes in 10-milligram doses three times daily until June 13th. At that time, as noted before, the quantity of librium given to Stukes was reduced to one 10-milligram dose per day before bedtime. The jury was not sworn until June 20th. Dr. Guy testified that the effects of librium continue for four or five hours. It is thus apparent that throughout his trial (and indeed for the entire period of his

incarceration except, of course, for the three days in late April when Stukes was given thorazine and congentin), Stukes was entirely unaffected by drugs, as far as his ability to confer with counsel is concerned. In respect to this, it should also be noted that trial counsel of extensive experience and recognized ability admittedly were "in constant communication" with Stukes during his confinement, and never once complained of his lack of competency to stand trial or inability to confer with them until June 14, 1967, after they learned of the tests ordered by Judge CARROLL.

Next, Stukes argues that he was denied his right to a speedy trial in contravention of Article I, §9 of the Constitution of the Commonwealth of Pennsylvania and of the Sixth Amendment of the Constitution of the United States. Stukes was arrested on April 3, 1966, and, after a preliminary hearing on April 4th, was held on charges of rape, robbery, burglary, and related offenses. On May 10th, Lena Alexandroff, the victim, died, and the charge of murder was added to the previous charges. The grand jury returned the murder indictments against Stukes and the two others who participated in the crimes, Burgess and Dessus, on the same day, May 10th. Also on May 10th, Stukes' counsel petitioned the lower court for an immediate trial, and for leave to retain an investigator and a pathologist. The last request was granted.

Burgess was brought to trial on August 22, 1966, and pleaded guilty. After an extensive hearing, he was found guilty of murder in the first degree and was, on August 27th, sentenced to death. On August 31, 1966, Stukes' counsel petitioned the court for leave to retain a special investigator whose services were alleged to be necessary for the preparation of Stukes' defense. This request was granted.

The Commonwealth attempted to bring Dessus to trial on September 26, 1966, but the trial court quashed the indictment for legal reasons and we affirmed this order on November 15, 1966. See *Commonwealth v. Dessus,* 423 Pa. 177, 224 A. 2d 188 (1966). These same legal infirmities existed as to the Stukes' indictment. The Commonwealth reindicted both Dessus and Stukes on January 9, 1967. Dessus was brought to trial before a jury in March and on April 7, 1967, he was found guilty of first degree murder and sentenced to life imprisonment. Stukes' trial began on June 6, 1967, and ended on June 30, 1967.

In considering whether Stukes was afforded a speedy trial, it must be remembered that "the essential ingredient [of the constitutional right to a speedy trial] is orderly expedition and not mere speed." *Smith v. United States,* 360 U.S. 1, 79 S. Ct. 991 (1959). The guarantee of a speedy trial "is an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself. However, in large measure because of the many procedural safeguards provided an accused, the ordinary procedures for criminal prosecution are designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself." *United States v. Ewell,* 383 U.S. 116, 120; 86 S. Ct. 773, 776 (1966). "The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice." *Beavers v. Haubert,* 198 U.S. 77, 87, 25 S. Ct. 573, 576 (1905).

In *Commonwealth ex rel. DeMoss v. Cavell,* 423 Pa. 597, 225 A. 2d 673 (1967), we held that the Petitioner was afforded a speedy trial despite a lapse of thirty-three months between his arrest and his trial. We said at page 601: "Because approximately thirty-three months elapsed between petitioner's arrest and his trial, he now claims that he was denied his right to a speedy trial under both the federal and state constitutions. We cannot agree. In the first place, the delay was not the result of improper prosecutorial tactics, but rather because petitioner's co-conspirators were tried first and because of the complexity of issues involved in the prosecution's case. Under the circumstances the delay cannot be categorized as unreasonable. Secondly, petitioner knew about his impending trial during the entire period of his incarceration and has not alleged how, if at all, the delay prejudiced his own trial preparation."

A quick perusal of the procedural chronology of this case, outlined above, reveals that the Commonwealth acted expeditiously, considering all of the circumstances, in bringing Stukes to trial. Fourteen months elapsed between his arrest and his trial. We can say here, as we did in *DeMoss,* supra, that "the delay was not the result of improper prosecutorial tactics but rather because [Stukes'] co-conspirators were tried first and because of the complexity of the issues involved in the prosecution's case." We agree with the lower court that the fourteen-month delay permitted Stukes' counsel to investigate the facts of the case quite thoroughly; it gave them the opportunity to observe the trials of Burgess and Dessus, and to prepare a defense with the knowledge of what the Commonwealth presented in those trials.

It is, of course, true that the delay in bringing Stukes to trial caused him great anxiety necessitating his psychiatric treatment; it is also quite true that Stukes' counsel petitioned for an immediate trial in

May and August of 1966.[4]  But in a case such as this, where, there are three defendants, each charged with murder, and each possessing the right to be tried independently,[5] someone must be tried last.  The district attorney has the discretion to schedule prosecutions as and when he deems appropriate, and no abuse of that discretion is evident here.  Stukes asserts that the delay prejudiced his case because of the interim unfavorable publicity referring to him as the "third man" of a trio of bandits; the lower court answered this argument by saying that "the delay caused the heat of this publicity to pass"; we agree with the lower court.

Additionally, Stukes argues that severe prejudice resulted to him at his trial by the damaging testimony of Paula Tuchar and her mother, Natalie, to the effect that Stukes was an accomplice of Burgess and Dessus, that he molested Paula, and actually raped Natalie. This testimony was not completely consistent with the statements of Paula and Natalie given to the police shortly after the occurrence, nor with their testimony before the committing magistrate, nor with the testimony of Natalie at the trials of Burgess and Dessus. Stukes argues that if his motions for an immediate trial had been granted with dispatch, he would have been tried and acquitted, because at that time, neither Paula nor Natalie had implicated him in the crimes committed against them.

Merely because the testimony of Paula and Natalie Tuchar was *prejudicial* to Stukes' case does not, of course, mean that Stukes suffered an unconstitutional deprivation of rights.  We must assume that any change

---

[4] It is questionable whether Stukes was really ready to go to trial at the times his counsel petitioned for an immediate trial, for on both occasions, his counsel also petitioned the court for leave to retain an investigator whose assistance was alleged to be necessary for the preparation of a defense.

[5] See the Act of March 31, 1860, P. L. 427, §40, 19 P.S. §785.

in the testimony of the Tuchars was voluntary since Stukes has not demonstrated that such change resulted from improper prosecutorial tactics. Stukes' counsel very effectively cross-examined the Tuchars about their testimonial inconsistency, and the jury evidently believed the witnesses. Certainly, an accused does not have a constitutional right to be tried at the very moment when the evidence seems to be most favorable to him, unless, of course, he can demonstrate that some constitutional right of his would be impaired by the delay.

Stukes presses one or two other arguments in his quest for a new trial, but they are meritless, and accordingly we dismiss them without discussion.

Judgment affirmed.

---

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

I concur in the result reached by the majority, but I cannot accept much of its reasoning, and I do not join in its opinion.

Most particularly, I cannot accept the majority's conclusion that the failure to give appellant's counsel notice of the psychiatric examination as required by the Pa. Rules of Criminal Procedure 304-307 was excused by the fact that the examination was not instigated by the district attorney. I do not find that fact to be in the least bit relevant, and I see nothing in the Rules to support the distinction which the majority sees between an examination requested by the district attorney and one requested by a prison psychiatrist. What the majority has done, in reality, is to provide a convenient mechanism for the Commonwealth to consistently and completely circumvent the notice requirements of the Criminal Rules. As long as the district attorney makes sure he "knows nothing," no notice need be given to counsel under the majority's theory.

In my view, appellant's counsel could have successfully moved to suppress the psychiatric report obtained in violation of the Criminal Rules had he chosen to do so. This, however, was not the strategy utilized. Instead, counsel requested and received a hearing at which the psychiatrists who prepared the report testified and were cross-examined. At the conclusion of the testimony, counsel did not dispute the findings of the doctors, but instead made their testimony the basis for his argument. Counsel at that point argued to the trial court that "if there existed any doubt in your mind concerning the mental ability of the defendant to cooperate with his counsel in the past or to presently cooperate with his counsel, such doubt has been firmly resolved after hearing his [this?] testimony. I think that it would do little purpose for me to repeat what the doctors have to say." Under these facts, I do not see how appellant was prejudiced by the failure of his attorney to receive notice of the psychiatric examination, and although I strongly disapprove of the violation of our Criminal Rules, I do not think that a reversal is warranted in this case. Cf. *United States ex rel. Wax v. Pate,* 409 F. 2d 498 (7th Cir. 1969).

I also believe that under *United States v. Wade,* 388 U.S. 218, 227-28, 87 S. Ct. 1926, 1932-33 (1967), counsel was not constitutionally required at the psychiatric examination because this is the type of event involving "scientific analyzing" at which there is "minimal risk that his [appellant's] counsel's absence . . . might derogate from his right to a fair trial." As long as an accused is taking psychiatric or psychological tests, or is being interviewed about life experiences by a psychiatrist, there is little a lawyer can do; the inquiry at that point is solely scientific. It is possible, of course, that the examination can also result in the eliciting of incriminatory statements, in

which case, it *is* a critical stage and counsel is necessary. Cf. *White v. Maryland*, 373 U.S. 59, 83 S. Ct. 1050 (1963) (preliminary hearing is critical stage where incriminating statements later used at trial are elicited therein).. That claim, however, is not made in this case.

I cannot accept the majority's facile statement that counsel was not necessary at the psychiatric examination because in an inquiry into competency, appellant had "nothing to lose." Were we dealing with a competency *hearing*, at which both sides were entitled to produce psychiatric evidence to support their positions, I have no doubt that counsel should be required, even though the accused would there too have "nothing to lose." Obviously if a result is reached contrary to the one the accused favors, he has "lost" something. Here however, there was no competency hearing. The hearing that was held, at which appellant's counsel accepted the psychiatric report, was in actuality a hearing on appellant's request for bail and a continuance. Counsel was present at that hearing in any case. Since counsel was not necessary at the psychiatric examination under *Wade*, I do not believe that appellant has any grounds for relief on this claim either.

Mr. Justice O'BRIEN joins in this opinion.