## Commonwealth *v.* Batley, Appellant.

378

Argued September 30, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Michael J. Wherry,* for appellant.

*Robert F. Banks,* Assistant District Attorney, with him *Joseph J. Nelson,* Assistant District Attorney, and *Edward M. Bell,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE JONES, January 9, 1970:

On the evening of March 28, 1968, Gary Batley, Kenneth Perrine [Batley's half-brother], Arthur Mc-Connell and Donald Hosack abducted four persons, namely, Kenneth Frick, Richard Dragan, Kathleen Kreminski and Jean Leister[1] from an automobile owned by Frick's father, which was parked near a deserted restaurant located on a rural road in Butler County.

At gunpoint Dragan and Frick were ordered from Frick's car, their wallets taken from them, and they were then forced into the trunk of a Ford motor vehicle which had been rented by McConnell from an agency in Mercer, Pennsylvania. The two girls were ordered into the interior of the same motor vehicle. The abductors then entered that vehicle and drove to a restaurant, at which time and place Perrine purchased beer, and the parties then proceeded to a place near a railroad siding.

During the evening of March 28th and the early morning of March 29th, the four men, who had been

---

[1] The Misses Kreminski and Leister were students at Slippery Rock State College.

previously unknown to the girls but who became known to them as Ken, Chris, Art and Don, repeatedly had sexual relations with both girls, either at gunpoint or with guns readily available, such assaults taking place in the area of the railroad siding, in several motor vehicles and at a farmhouse owned by McConnell near Mercer, Pennsylvania.

After leaving the railroad siding area, Perrine and McConnell broke into a Pennsylvania Highways Department shed and stole two long-handled shovels. The four men with the two girls then proceeded to a lane near a strip mining area, known as "Pizor's," at which point Perrine and McConnell left the motor vehicle and departed with the shovels, which had been on the floor of the back seat of the motor vehicle. The two men returned approximately one-half hour later. Perrine and Hosack, at gunpoint, then ordered Frick out of the trunk of the motor vehicle, took him with them down the lane and later returned without him.

Some time later, the men obtained another Ford motor vehicle. Two of the men, with the Kreminski girl, then rode in the one motor vehicle, and the other two men, with the Leister girl, rode in the other motor vehicle. At approximately 5:00 a.m. on March 29, 1968, both motor vehicles proceeded to McConnell's farmhouse, and, shortly after arriving there, Perrine and McConnell departed in the one motor vehicle, leaving at the farmhouse Batley, Hosack, the two girls and Dragan. Dragan, up to that point, had been continuously confined in the trunk of the one motor vehicle but was released from the trunk at that time.[2] After the departure of Perrine and McConnell, Dragan, who had been tied up and placed in an upstairs bed-

[2] There is evidence that, prior to arriving at the McConnell farmhouse, Batley had told the two girls to try to escape and had given them directions in which to go to seek aid, but the girls were afraid to follow his suggestion.

room at the farmhouse, managed to untie himself. The fact that Dragan was untied was unknown to Hosack but known to Batley. Without Hosack's knowledge, Batley then managed to give a knife to Dragan, and, shortly thereafter, Batley left the farmhouse. Dragan and the two girls finally managed to overpower Hosack, ran away from the farmhouse, and notified the Pennsylvania State Police of the incidents. In all, Dragan and the two girls had been with the abductors from approximately 9:00 p.m. on March 28th until 10:00 a.m. on March 29th.

When the police were notified, the girls and Dragan knew the abductors only by their nicknames and did not know Frick's whereabouts although the girls had been told that Frick had been tied up in the strip mine area and that, if he was unable to extricate himself, he would no doubt be found by persons working in and about the strip mine area.

The police then began an extensive investigation to locate Frick and to apprehend the abductors. The search continued until approximately 9:30 p.m. on March 29th, and, during the course of the search, the girls accompanied the police, endeavoring to point out various points and locations which they recalled during the time they were in the custody of their abductors. On March 29th, at approximately 9:20 p.m., Batley, accompanied by his mother and his girl friend's mother, appeared at the Mercer substation of the Pennsylvania State Police and gave himself up. He was removed from the presence of his mother and his girl friend's mother, taken into an office in the substation, and, in the presence of four State Policemen and before any questioning, he was given the *Miranda* warnings.[3] The police handed Batley a card containing the warnings, then asked each of the questions of Batley, to which

---

[3] *Miranda v. Arizona*, 384 U. S. 436, 86 S. Ct. 1602 (1966).

Batley responded. After Batley had been given these warnings and upon his indication that he was aware of his constitutional rights and did not want counsel, questioning then began.[4] Shortly after the questioning began, Batley told the police that Perrine and Hosack had taken Frick up "Skunk Lane," located near a house owned by a family named Bestwick and that, when Perrine and Hosack returned, they said that they had shot Frick. At that point the questioning ceased, and the police officers, accompanied by Batley, went to the area indicated, followed footprints up the lane, noticed a spot where there had been recent digging and found Frick's body lying in a grave two feet deep. Batley was then returned to the substation, again orally given the *Miranda* warnings to which he responded, and then Batley made a statement which was tape recorded.

Subsequently, Batley was charged with murder, burglary, rape and armed robbery and was indicted on all these charges. When arraigned, Batley and the three other men pleaded guilty to two counts of rape, to armed robbery and to murder generally. A three-judge court then sat, accepted Batley's pleas, entered into a hearing, and, after hearing, Batley was

---

[4] The warnings, first given orally and, then by handing Batley a card containing the warnings, were as follows: "I am a police officer. I warn you that anything you say will be used in a court of law against you; that you have an absolute right to remain silent; that you have the right to advice of a lawyer and the presence of a lawyer here with you during questioning and;—that, if you cannot afford a lawyer, one will be appointed for you free before any questioning if you desire. You can stop talking at any time you desire and request an attorney before you proceed further." After a pre-trial hearing on a motion to suppress statements made by Batley, the court below found that these warnings were read to Batley, that he was given a typewritten copy of the warnings, that Batley's mother was present in the substation and afforded an opportunity to talk to her son and that Batley intelligently and knowingly waived his right to counsel before questioning began.

found guilty of murder in the first degree, of rape and armed robbery. Batley was sentenced on the murder conviction to life imprisonment, to two 10 to 20-year terms on the rape conviction, said terms to run consecutively, and to a 5 to 10-year sentence on the armed robbery conviction, that sentence to run concurrently rather than consecutively. From the judgment of sentence to life imprisonment on the murder conviction, the instant appeal has been taken.

On this appeal, five questions are raised: (1) On an apeal from a finding by a three-judge court of murder in the first degree, what is the scope of appellate review? (2) Were the statements obtained from Batley secured in violation of his constitutional rights? (3) If Batley's statements were unlawfully secured, were the "fruits" of such confessions improperly permitted into evidence? (4) Did the court below err in refusing, after conviction, Batley's motion to withdraw his plea of guilty? (5) Was the evidence sufficient to sustain a finding of murder in the first degree?

I.

Rule 1115,[5] *Pa. R. Crim. P.*, provides:

"(a) When a defendant enters a plea of guilty to a charge of murder, the judge before whom the plea is entered shall hold a hearing to determine whether the case may constitute murder in the first degree. If, after the Commonwealth's presentation of its evidence, the judge is of the opinion that the case does not rise higher than murder in the second degree, he shall proceed to hear all the evidence, determine the crime and impose sentence.

"(b) If, after the presentation of the Commonwealth's evidence, the judge is of the opinion that the

---

[5] Adopted January 24, 1968, effective August 1, 1968.

case may constitute murder in the first degree, he may secure the assignment of two other judges of like jurisdiction and power to sit with him to hear the evidence and decide all issues of law and fact. In cases where a panel of three sits, the decision of the court as to the crime shall be by a majority of the judges, but if they determine that the crime is less than murder in the first degree, the judge before whom the plea was entered shall alone determine and impose sentence.

"(c) If the crime is determined to be murder in the first degree, the sentence shall be life imprisonment unless the judges unanimously agree upon a sentence of death."

In the case at bar, after Batley entered a plea of guilty to murder generally, a three-judge court was immediately convened to hear the evidence and determine the degree of the crime and the appropriate punishment.

On this appeal, Batley contends that, after a three-judge court has determined that the crime as proven is murder in the first degree and after it has imposed a sentence of life imprisonment, judicial review at the appellate level has the competency to consider the admissibility of derivative evidence secured as the result of an allegedly improperly-obtained confession or confessions and whether a court abused its discretion in refusing a motion to withdraw the plea of guilty made prior to the imposition of sentence. See: *Pa. R. Crim. P.* 320.

A plea of guilty to murder generally, upon acceptance and entry by a court, is in itself sufficient to sustain a conviction of murder in the second degree, and, in reviewing, at the appellate level, a defendant's conviction, we have held that we look simply to the validity of the plea as entered and the lawfulness of the sentence. See: *Commonwealth ex rel. Davis v. Russell,*

422 Pa. 223, 226, 220 A. 2d 858 (1966); *Commonwealth v. Stokes,* 426 Pa. 265, 267-68, 232 A. 2d 193 (1967).

However, in *Commonwealth ex rel. Kern v. Maroney,* 423 Pa. 369, 223 A. 2d 706 (1966), this Court, even though recognizing that a plea of guilty to murder generally equated a conviction of murder in the second degree and constituted a waiver of all judicial defects and defenses, held that appellate review could inquire into the sufficiency of the evidence to sustain a conviction of murder in the first degree.

Moreover, in *Stokes* (footnote, p. 268), we noted an exception to the general rule and recognized that where, after a plea of guilty to murder generally, the defendant had been convicted of murder in the first degree, such defendant might have *other errors* to present upon direct review, in addition to the validity of the plea and the lawfulness of the sentence. *Accord*: *Commonwealth v. Zaffina,* 432 Pa. 435, 438, 248 A. 2d 5, 6-7 (1968); *Commonwealth v. Walters,* 431 Pa. 74, 76-77 (n.1), 244 A. 2d 757, 759 (1968). The orbit of errors reviewable upon a direct appeal from a judgment of sentence after a conviction of murder in the first degree following a plea of guilty to murder generally has not been explicitly and specifically delineated by our Court but it does seem evident, under *Stokes* and *Walters,* that, in addition to determining the validity of the plea and the lawfulness of the sentence imposed, appellate review embraces an inquiry as to whether the evidence was sufficient to justify a finding of murder in the first degree and the admissibility or inadmissibility of evidence upon which the conviction was bottomed.

Furthermore, upon direct appeal from a judgment of sentence, such as in the case at bar, it seems clear beyond question that on appellate review we have the right to and should determine whether the court below committed error in refusing to permit the with-

drawal of a plea of guilty. See: *Commonwealth v. Scoleri*, 415 Pa. 218, 202 A. 2d 521, 203 A. 2d 319 (1964); *Commonwealth v. Feldman*, 432 Pa. 428, 248 A. 2d 1 (1968).

Prior to Batley's trial, his counsel moved to suppress the statements made by him as well as the "fruits" of his confessions or statements, and the court below at this pretrial hearing denied the motion to suppress. Batley now urges that since he had no right of appeal from the order denying suppression, because of its interlocutory nature (*Commonwealth v. Washington*, 428 Pa. 131, 236 A. 2d 772 (1968); *Commonwealth ex rel. Fisher v. Stitzel*, 418 Pa. 356, 211 A. 2d 457 (1965)), he should now have the right to challenge not only the validity of the confessions but also the admission into evidence of the "fruits" of such confessions. We agree.

## II.

In determining whether the statements of Batley were illegally obtained, we must consider the rather bizarre and unusual incidents which form part of the factual background underlying Batley's argument in this respect.

Michael Wherry, Public Defender of Mercer County, having been alerted on March 29th by the District Attorney's office that the police were looking for four persons who allegedly had ravished the two girls and caused the disappearance of Frick, at approximately 4:00 p.m. on that date, appeared at the Pennsylvania State Police substation, talked to certain of the police officers and requested them not to question any of the suspects, upon their apprehension, unless he was present. At this time none of the four persons had been apprehended, none was in custody and, moreover, insofar as the police were concerned, Frick had disappeared but there was no evidence that Frick was

dead. Upon refusal of the police officers to agree to Wherry's request, he then presented a petition to Judge ACKER of the court below, requesting the entry of an order directing the Pennsylvania State Police not to interfere with or violate any of the unapprehended suspects' constitutional rights and directing the police officers not to question any of the suspects in the absence of the Public Defender. Judge ACKER denied this petition, called a lieutenant of the State Police, informed him of the denial of the Public Defender's petition and advised the State policeman that it was the function of the police to make an investigation, at the same time warning him that, before questioning, any suspect should be fully advised of his constitutional rights and that the suspect has the right to waive such constitutional rights if he does so voluntarily and intelligently.

After Batley voluntarily surrendered himself, his questioning was not done in the Public Defender's presence, nor was he informed that Batley had surrendered himself to the police.

A review of the record, insofar as it portrays the circumstances surrounding the several questionings of Batley, indicates clearly that Batley was fully informed of his constitutional rights and elected, knowingly and intelligently, to waive these rights.[6]

The court below, painstakingly, at the pretrial hearing, inquired into the circumstances surrounding the questioning and concluded "that the statement made by Gary Lee Batley should not be suppressed since he waived his right to counsel and voluntarily made this statement." We thoroughly agree with the conclusion of the court below.

---

[6] In this connection, it is significant that the record indicates that Batley's mother suggested that she would get an attorney for her son but he informed her that he did not want an attorney and wanted to make a clean breast of his part in the affair.

Moreover, it must be pointed out that the Commonwealth did not at Batley's trial seek to introduce into evidence any statement or statements made as the result of the questioning of Batley nor did it rely on such statement or statements of Batley in securing this conviction.

### III.

Batley next argues that, even though the Commonwealth did not use his statement or statements in presenting its case, the Commonwealth did utilize the "fruits" thereof in that it was through the medium of Batley's original statement that Frick's body was eventually found. We have determined that the statement or statements taken from Batley were not illegally secured, that proper and adequate warnings were given before such statement or statements were taken, and that the record points out without equivocation that Batley voluntarily waived his rights in making such statement or statements. Having reached such conclusion, we need not consider the admissibility of evidence secured as the result of such statement or statements of Batley. The "fruits of the poisonous tree" doctrine applies only to derivative evidence secured from illegal confessions. Having determined the confessions were legally obtained, we do not reach the "fruits of the poisonous tree" argument of Batley.

### IV.

We next consider whether the court below abused its discretion in refusing to permit Batley to withdraw his guilty plea, such withdrawal having been requested after conviction but prior to the imposition of sentence.

Rule 320, *Pa. R. Crim. P.*, provides that, at any time before sentence, the court may, in the exercise of

its discretion, permit or direct a plea of guilty to be withdrawn and a plea of not guilty substituted. In accordance with that Rule and in line with our case law, the withdrawal of a guilty plea is a matter which lies within the discretion of the court below (*Commonwealth v. Scoleri*, 415 Pa. 218, 202 A. 2d 521 (1964); *Commonwealth v. Kirkland*, 413 Pa. 48, 195 A. 2d 338 (1963)), and only where such abuse of discretion has been clearly demonstrated will the action of the court below be reversed. See: *Commonwealth v. Scoleri*, 415 Pa. 218, 202 A. 2d 521 (1964); *Commonwealth ex rel. Rivers v. Myers*, 414 Pa. 439, 200 A. 2d 303, cert. den., 379 U.S. 866 (1964); *Commonwealth v. Phelan*, 427 Pa. 265, 234 A. 2d 540, cert. den., 391 U.S. 920 (1967).

We have carefully reviewed the instant record and such review persuades us that the court below did not abuse its discretion in refusing to permit the withdrawal of the guilty plea. The plea of guilty was entered voluntarily and intelligently by Batley, who at that time and for some time prior thereto was represented by counsel. The sole argument in support of Batley's right to withdraw his plea is that the Commonwealth utilized Batley's direction as to the location of Frick's body, that such direction arose from an illegally-obtained statement and, hence, the plea was induced by tainted evidence. We have previously determined that Batley's statement was not illegally obtained. The instant record reveals no evidence nor even any inference that Batley, at the time he entered his plea, was induced or influenced to do so by any tainted evidence. Batley's contention in this respect lacks merit.

### V.

Lastly, Batley urges that the Commonwealth's evidence was not sufficient to justify his conviction of first-degree murder.

To sustain Batley's conviction, the evidence must be sufficient to prove his guilt beyond a reasonable doubt under the felony-murder statute.[7] In *Commonwealth v. Redline*, 391 Pa. 486, 495, 496, 137 A. 2d 472 (1958), this Court held that "in order to convict for felony-murder, *the killing must have been done by the defendant or by an accomplice or confederate or by one acting in furtherance of the felonious undertaking* [citing authorities]" and that "the thing which is imputed to a felon for a killing incidental to his felony is *malice* and *not the act of killing."* That the killing need not be by the defendant in a felony-murder case is well settled. If the killing is by one acting in concert or in furtherance of a common design with the defendant, the latter is equally guilty.

In the case at bar, while the evidence reveals that Batley did not kill Frick, it is equally clear that either Perrine or Hosack or both, Batley's companions, killed Frick. The inquiry is whether the homicide of Frick occurred under such circumstances as to justify Batley's conviction under the felony-murder doctrine.

The record unequivocally shows that, prior to the killing of Frick, at least three other felonies were committed—all within the language of the felony-murder statute—with Batley's active or passive participation therein, *i.e.*, the armed robbery of the contents of the wallets of Frick and Dragan, the burglary of the Highways Department tool shed and the repeated rapes of the two girls. Viewing the evidence in the light most favorable to the Commonwealth—as we are required to do—we are fully satisfied that the evidence

---

[7] Acts of June 24, 1939, P. L. 872, §701, and December 1, 1959, P. L. 1621, §1, 18 P.S. §4701. In line with our well-settled rule, we viewed the evidence and reasonable inferences therefrom in the light most favorable to the Commonwealth.

supports and sustains Batley's conviction of first-degree murder under the felony-murder statute.

The concatenation of events which transpired points unequivocally to a common design on the part of Batley and his three companions to engage in, at least, robbery and rape. Batley, *armed* with a gun which he termed "Old Faithful," joined by three *armed* companions, held up and robbed Frick and Dragan of the contents of their wallets, forced the two girls into McConnell's rented vehicle and imprisoned the two young men in the trunk of that vehicle. Batley then proceeded to the point near the railroad crossing with his companions and participated in the ravishment of the two girls. While the evidence does not indicate that Batley broke into and entered the tool shed and stole therefrom the shovels, the evidence is that he remained in the motor vehicle while the burglary took place, obviously to aid in preventing the escape of the two girls. While the evidence does not indicate that Batley actually took part in the digging of Frick's grave and the actual shooting of Frick—in fact, he was then engaged in again ravishing one of the girls—the record indicates that he knew what his companions were doing and neither remonstrated with them nor attempted to withdraw and disassociate himself from the venture. Not until approximately an hour later, when he and McConnell went up the road—obviously to prepare the same fate for Dragan as that which befell Frick—did Batley "chicken out" and refuse to do away with Dragan. Throughout all the hours and events of March 28th and March 29th until after Frick's killing, Batley remained armed and a partner in the venture.

When one considers all that transpired, it is clear beyond any reasonable doubt that, by common design and plan, Batley, with his companions, all armed, set out on the evening of March 28th to commit robbery

and rape; in so doing, Batley assumed the risk that a killing might occur through the acts of one or more of his companions. Frick's killing was within the orbit of the risk of the venture to which Batley committed himself, and he made no effort whatsoever to withdraw from the venture until after the killing had taken place.

The record supports the existence of a criminal conspiracy on the part of Batley and his companions to commit robbery and rape. Proof of the existence of such a conspiracy may be inferentially established by proof of the relation, conduct or circumstances of the parties and the acts of the parties may demonstrate a concerted action pursuant to a common design to accomplish a common purpose. See: *Commonwealth v. Neff*, 407 Pa. 1, 179 A. 2d 630 (1962). The instant circumstances reveal the existence of a concerted purpose on the part of these four armed men to commit, at least, the felonies of robbery and rape. The argument that the felonies committed had no connection with the killing of Frick or were too remote in time is definitely refuted by the evidence of record. Frick was killed by one or more of Batley's fellow conspirators, and for that killing Batley was properly found guilty of first-degree murder under the felony-murder statute.

Judgment affirmed.

Mr. Chief Justice BELL concurs in the result.