UNITED STATES of America ex rel.
James A. STUKES

v.

John P. SHOVLIN, Superintendent, Fair-
view State Hospital, Waymart, Pa.

Civ. A. No. 70–255.

United States District Court,
E. D. Pennsylvania.

June 4, 1971.

Beasley, Albert, Hewson & Casey,
Philadelphia, Pa., for petitioner.

Arlen Specter, Dist. Atty., Philadel-
phia, Pa., for defendant.

OPINION AND ORDER

TROUTMAN, District Judge.

In this habeas corpus proceeding, re-
lator, a State prisoner, incarcerated at
Fairview State Hospital in Waymart,

Pennsylvania, attacks his conviction of first-degree murder. Relator's conviction arose from the murder of 78-year old Lena Alexandroff, whose death resulted from a beating inflicted during the course of a robbery in which the decedent, her 44-year old daughter and her 14-year old granddaughter were beaten and raped. Relator and two co-defendants were charged with murder and were tried separately. Relator's post-trial motions were denied in an exhaustive opinion by the trial judge and, on direct appeal, the Pennsylvania Supreme Court affirmed. Commonwealth v. Stukes, 435 Pa. 535, 257 A.2d 828 (1969).

In the present petition relator raises various grounds for relief, all of which have been considered and decided adversely to him in the State proceedings. We have carefully reviewed the extensive State record. The record indicates that the relevant factual matters have been fully and reliably developed at the State proceeding so as to obviate the necessity of a further evidentiary hearing in this Court. 28 U.S.C. § 2254; Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed. 2d 770 (1963). Furthermore, we find the facts as determined by the State courts to be amply and fairly supported by the record. We will proceed and treat the issues in the order presented.

Relator first contends that he was denied the right to effective representation of counsel at a critical stage of the proceedings against him; namely, at a pretrial ex parte psychiatric examination ordered by the Common Pleas Court to determine his competence to stand trial. The facts as developed in the State proceedings appear in the Pennsylvania Supreme Court's opinion at pages 539–541 of 435 Pa., at page 830 of 257 A.2d as follows:

"Stukes was arrested on April 3, 1966. Able counsel was appointed to represent him on April 28th. His trial, i. e., the voir dire examination and the selection of jurors, began on June 6, 1967.

"Pursuant to an order entered on May 5, 1967, by the Honorable Vincent A. Carroll, President Judge of the Philadelphia Courts, Stukes was examined on May 19th by two psychiatrists and a psychologist to determine if he was competent to stand trial. Such an examination was requested by Edward A. Guy, M.D., Director of the Division of Psychiatry of the Philadelphia prisons. Neither the District Attorney nor defense counsel were notified of the petition or the court's order and neither were present during the examination. During the examination, no questions were asked pertaining to the alleged offense and Stukes was cautioned not to volunteer any such information. As a result of the examination, the examining physicians concluded that Stukes was 'able to cooperate with counsel and to understand the nature of the proceedings against him'.

"The question of Stukes' competency to stand trial first arose in Dr. Guy's mind following an examination that he made of him on April 24, 1967, during which the Doctor found Stukes 'acutely agitated and fearful'. He prescribed that Stukes be given thorazine, a major tranquilizer which affects the central nervous system. The use of this drug was discontinued on April 28th, upon which date Stukes was given one dose of cogentin to combat drowsiness, one of the side effects of thorazine. From April 28th until June 13th, Stukes was given three ten-milligram doses of librium each day and thereafter the dosage was reduced to a simple ten-milligram quantity of librium each day, given prior to bedtime. (Footnote omitted)"

Relator contends that the pretrial ex parte psychiatric evaluation by the Commonwealth doctors was a "critical stage" of the proceedings against him constitutionally requiring the presence and assistance of counsel.

In United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the Supreme Court specifically held that

a suspect in a criminal case has a Sixth Amendment right to the presence and assistance of counsel at a post-indictment pre-trial lineup because such is deemed a "critical stage" of the prosecution's proceedings against him. In *Wade* it was further noted that the courts should "scrutinize any pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have the effective assistance of counsel at the trial itself". 388 U.S. at 227, 87 S.Ct. at 1932.

A "critical stage" of the prosecution was defined generally by the *Wade* Court as "any stage of the prosecution, formal or informal, in or out of court, where counsel's absence might derogate from the accused's right to a fair trial". 388 U.S. at 226, 87 S.Ct. at 1932. It is clear that the basic right of the accused sought to be protected by affording counsel at a given stage of a criminal proceeding is his right to a fair trial. It is also apparent that counsel's presence at what may be considered a "critical stage" of the proceedings is mandated because counsel's legal training and expertise may then be employed on behalf of the accused to observe, discover and prevent possible unfairness or irregularity in police procedures which may later irreparably prevent a basically fair determination of guilt or innocence. The need for counsel's presence in *Wade* was clearly indicated to insure the fairness of lineup identifications where the accused was confronted by his accusers for the purpose of identifying him as a participant in the crimes charged. Clearly, a defendant's rights may be irreparably lost and a fair trial denied if intentional or unintentional suggestion produces the testimony which ultimately identifies the defendant as the criminal [1]

A pre-trial psychiatric evaluation to determine competency to stand trial, however, stands on different footing and, in this Court's opinion is not a "critical stage" of the proceedings in the constitutional sense requiring counsel's presence. Counsel's absence from the physician analyses or interviews of the defendant involves only a minimal risk to a defendant's right to a fair trial because of the nature of a psychiatric examination and because of the limited role which counsel can play in employing his legal skills to protect the accused's rights. The examination by the psychiatrists or psychologists, although admittedly less purely scientific than fingerprint analysis or blood sampling, bears a strong analogy to such tests as far as the reasons why it is inappropriate to constitutionally require counsel's presence. The *Wade* Court recognized that a lawyer's access to knowledge of scientific procedures and data furnishes sufficient bases from which he can meaningfully cross-examine a scientific expert on his scientific findings. He need not be physically present at the actual testing to do this. To our understanding, a psychiatric evaluation is largely based upon judgments drawn from physical observation of the subject as well as from conversations with him. It does not appear that the presence of counsel and employment of his legal talent can be useful in protecting a defendant's rights at this stage since counsel, as a practical matter, can do nothing than to test the accuracy of medical conclusions drawn from a doctor's observations.

As is evident from the State record in this case, counsel's absence from the actual psychiatric evaluation in no way prevented meaningful and extensive cross-examination of the doctors who evaluated relator. Counsel made a full and thorough inquiry into the doctors' findings concerning relator's competence

---

1. See also Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961) (absence of counsel at arraignment violates the Fourteenth Amendment's due process clause), and White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963) (absence of counsel at a preliminary hearing in violation of due process).

to stand trial. Furthermore, at the actual psychiatric evaluation relator was not confronted with potential adverse witnesses who would testify at his trial concerning his criminal responsibility. The record clearly indicates that neither the doctors' testimony nor their reports were introduced for any reason at his trial.

It may well be that an analogy can be drawn between the questioning process at a psychiatric interview and the custodial interrogation referred to in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). It may be argued that the presence of counsel is, therefore, necessary to enable a defendant to intelligently exercise his Fifth Amendment rights. Although not expressly raised by counsel, it appears that the problem is raised by the circumstances. We cannot, however, adopt the view that a psychiatric evaluation is equivalent to custodial interrogation since clearly their purposes are distinct and have different aims. A psychiatric evaluation is not conducted by the police with a view to eliciting inculpatory statements, but rather is conducted by medical experts in order to objectively ascertain a defendant's legal competency to stand trial. In the instant case, it is clear from the State record that relator was advised at the psychiatric interview not to volunteer any information regarding the alleged crime; he volunteered none, and in fact, nothing concerning his examination was presented to the jury as evidence against him. The doctors' testimony was evaluated only by the trial judge at a separate hearing. The general warnings given here we find to have been sufficient, considering the nature of the examinations and the intended use of the doctors' testimony. Perhaps, had the examination been designed to elicit and had elicited inculpatory utterances which were introduced into evidence against relator, there may be prejudice shown resulting from the absence of counsel. However, such is not the instant case, and, lacking any showing of prejudice, we find no basis for relator's contention that his right to a fair trial was abridged by the ex parte psychiatric examination in counsel's absence. See United States ex rel. Wax v. Pate, 298 F.Supp. 164 (N.D.Ill.1967) aff'd. 409 F.2d 498 (7th Cir. 1969). We do add that giving notice of a psychiatric examination to counsel is the better and more acceptable practice. However, we do not believe that constitutional principles mandate counsel's presence, and absent a showing of prejudice as here, failure to give notice of itself cannot render relator's trial constitutionally defective. United States ex rel. Wax v. Pate, 409 F.2d at 499.

Relator's second and third contentions are interrelated with his first. Relator contends that certain rulings of the trial judge improperly limited counsel's inquiry into the medical qualifications of the expert witnesses at his pre-trial competency hearing and restricted examination into relator's prison records. Relator further contends that during his trial he was under the influence of drugs. This he contends prevented him from taking the stand in his own behalf and placed him in a dazed state subject to misinterpretation by the jury.

These contentions we find to be without merit. First of all, relator's argument concerning the trial judges limiting counsel's examination into doctors' qualifications and certain medical records, does not raise an issue of constitutional dimensions. 28 U.S.C. § 2254. The actions of the trial judge upheld on review by the Pennsylvania Supreme Court involved matters of pre-trial procedure committed to the sound discretion of the trial court not affecting the substantial rights of defendant. The qualifications of an expert witness, being a matter committed to the trial judge's sound discretion, is not reviewable on habeas corpus unless clearly erroneous. United States v. Alker, 260 F.2d 135, 155 (3rd Cir. 1958) cert. denied 359 U.S. 906, 79 S.Ct. 579, 3 L.Ed.2d 571 (1959). Likewise, a ruling as to what portions of certain of relator's prison records were relevant to the issue of competency

to stand trial is also a matter of discretion reviewable only for clear error. Here, the record does not indicate a clear error or a showing of prejudice to the substantial rights of relator of constitutional magnitude.

■ As to relator's contention that he was in a drugged state during the trial, we find this contention unsupported by the record. Relator in essence is attempting to re-litigate the issue of competency decided adversely to him in the trial court. This contention was adequately and reliably determined by the Pennsylvania Supreme Court as follows:

"[T]here is no evidence in the record that Stukes was at all influenced by drugs at his trial. Major tranquilizers were given to Stukes for the span of three days, from April 26th to April 28, 1967. Thereafter librium, a minor tranquilizer which has no general depressing effect on the mind, but merely relieves anxiety, was given to Stukes in 10-milligram doses three times daily until June 13th. At that time, as noted before, the quantity of librium given to Stukes was reduced to one 10-milligram dose per day before bedtime. The jury was not sworn until June 20th. Dr. Guy testified that the effects of librium continue for four or five hours. It is thus apparent that throughout his trial (and indeed for the entire period of his incarceration except, of course, for three days in late April when Stukes was given thorazine and cogentin), Stukes was entirely unaffected by drugs, as far as his ability to confer with counsel is concerned. In respect to this, it should also be noted that trial counsel of extensive experience and recognized ability admittedly were 'in constant communication' with Stukes during his confinement, and never once complained of his lack of competency to stand trial or inability to confer with them until June 14, 1967, after they learned of the tests ordered by Judge Carroll." 435 Pa. at 543–544, 257 A.2d at 832.

As to these factual determinations, there is ample support in the State record.

The record indicates clearly that relator was not affected in any detrimental way by drugs during his trial or during nontrial hours when counsel reasonably might have consulted with him. For the entire trial period, excepting a few days of the voir dire, relator's drug consumption amounted to ten milligrams of librium nightly at bedtime, the equivalent of a nightly sleeping pill. Only for three days during mid-April did relator receive major medication and since this was remote from the beginning of the trial, it did not interfere with relator's ability to function during the trial or during the preparation period prior to trial. In fact, during the period from his arrest on April 3, 1966, to April 27, 1967, relator received no drugs. Obviously, relator conferred with counsel to prepare his case during this substantial period of time. Our independent review of the record indicates that the State findings are amply supported by the record and, finding no support for relator's arguments, we reject relator's second and third contentions.

Relator's next contention is that he was denied his Sixth Amendment right to a speedy trial. Again, the relevant facts, amply supported in the record, appear in the Pennsylvania Court's opinion at pages 544 and 545, 257 A.2d at page 832:

"Stukes was arrested on April 3, 1966, and after a preliminary hearing on April 4th, was held on charges of rape, robbery, burglary, and related offenses. On May 10th, Lena Alexandroff, the victim, died, and the charge of murder was added to the previous charges. The grand jury returned the murder indictments against Stukes and two others who participated in the crimes, Burgess and Dessus, on the same day, May 10th. Also on May 10th, Stukes' counsel petitioned the lower court for an immediate trial, and for leave to retain an investigator and a pathologist. The last request was granted.

"Burgess was brought to trial on August 22, 1966, and plead guilty. After an extensive hearing, he was

found guilty of murder in the first degree and was, on August 27th, sentenced to death. On August 31, 1966, Stukes' counsel petitioned the Court for leave to retain a special investigator whose services were alleged to be necessary for the preparation of Stukes' defense. This request was granted.

"The Commonwealth attempted to bring Dessus to trial on September 26, 1966, but the trial court quashed the indictment for legal reasons and we affirmed this order on November 15, 1966. (Citation omitted.) These same legal infirmities existed as to the Stukes' indictment. The Commonwealth reindicted both Dessus and Stukes on January 9, 1967. Dessus was brought to trial before a jury in March and on April 7, 1967, he was found guilty of first degree murder and sentenced to life imprisonment. Stukes' trial began on June 6, 1967, and ended on June 30, 1967."

█ A preliminary issue is presented, namely, whether the Sixth Amendment right to a speedy and public trial is applicable to the instant case. We hold that it is. The Sixth Amendment right to a speedy trial was made applicable to the States on March 13, 1967, in Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). Relator's trial actually began on June 6, 1967, after the date Klopfer was decided. The delay complained of, however, took place in major part prior to Klopfer. It is not clear from a reading of the cases at what point during the criminal process a defendant's right to a speedy trial attaches for determining the applicability of Klopfer. However, we believe that Klopfer should have application here. We base this conclusion in part on the Supreme Court's decision in Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969) where the Court noted that the "Sixth Amendment right to a speedy trial is enforceable against the States as 'one of the most basic rights preserved by our Constitution'". 393 U.S. at 374–375, 89 S.Ct. at 575.

Additionally, in Dickey v. Florida, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970) the Supreme Court recognized the application of the Sixth Amendment's speedy trial provision to a State prosecution in which the delays occurred seven years prior to Klopfer, but where the petitioner's trial occurred after Klopfer was decided. This in essence is this case. Therefore, we hold that the speedy trial provision of the Sixth Amendment has application here.

When measured from the date of relator's arrest on April 3, 1966, to the date his trial actually began on June 6, 1967, we are dealing with a delay of approximately fourteen months. In addition to the lapse of time, relator points to various elements of prejudice resulting from the delay. The State record does indicate that relator while incarcerated suffered from an acute situational anxiety condition which necessitated the administration of both major and minor tranquilizers beginning on April 27, 1967. The three medical experts who examined relator basically agreed that relator's anxiety condition was directly connected to his incarceration and pending murder trial. Relator also argues other elements of prejudice resulting from the delay, namely, that the delay resulting in his anxiety condition effectively precluded him from taking the stand in his own defense, that he was exposed to certain inflammatory publicity referring to him as the "third man" in a triple rape prosecution and that he was unable to counteract changes in the testimony of the prosecution's principal witnesses which allegedly developed during the delay. The arguments presented are not insubstantial.

In United States v. Ewell, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966) the Supreme Court recognized that the guarantee of a speedy trial "is an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself.

* * * " 383 U.S. at 120, 86 S.Ct. at 776. The "essential ingredient [of the speedy trial guarantee] is orderly expedition and not mere speed". Smith v. United States, 360 U.S. 1, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959) "[B]ecause of the many procedural safeguards provided an accused, the ordinary procedures for criminal prosecution are designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself." United States v. Ewell, *supra*, at 120, 86 S.Ct. at 776. Therefore, the right to a speedy trial "is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice." Beavers v. Haubert, 198 U.S. 77, 87, 25 S.Ct. 573, 576, 49 L.Ed. 950 (1905).

Mr. Justice Brennan, concurring in Dickey v. Florida, *supra,* has pointed out the lack of indepth analysis of the right to a speedy trial in the decided cases.

It does, however, appear that both the rights of the accused and the interests of society must be weighed, considering, *inter alia,* the source of the delays, the reasons for the delays, the resultant prejudice to the accused and the effects of the delays on the interests of the orderly administration of public justice.

The record here indicates that the sources of the delay here can be variously identified. Relator was arrested along with two other co-defendants on April 3, 1966. On April 4, 1966, a preliminary hearing was held on the charges of rape, robbery and burglary. The charge of murder was not yet in the case at this point. On May 10, 1966, Lena Alexandroff, one of the victims of the rapes and beatings, died and on that day murder indictments were returned against all three defendants by the grand jury. At this point, relator's counsel petitioned the trial court for an immediate trial. This petition was opposed by the Commonwealth. The defendant's motion was denied. In a sense, it can be said that the Commonwealth can, by its opposition to relator's motion, be identified at that time as a source of delay. However, none of the ends of justice to the accused or to the public would have been served by an immediate trial at that time. The case at this point in time was in its embryonic stage from both a prosecution and a defense standpoint. This is quite apparent since on the same day, May 10, relator's counsel also petitioned for leave to retain an investigator and a pathologist.

It is quite apparent that the reason these motions were made by defense counsel was because these experts were necessary to the preparation of an adequate defense. These motions were granted. Again, in the same sense, it can be said that relator can be identified as a source of delay by making various pre-trial motions. Additional pre-trial motions requiring argument and Court action were in the record, including a motion on August 31, 1966, by relator to retain a special investigator necessary for the preparation of his defense. So, in sum, the sources of the delay can be identified to the relator as well as to the Commonwealth. It appears that here an analysis of the source of delay being variously distributed between defense and prosecution is not very helpful to a resolution of the ultimate issue. It is only helpful insofar as it does not identify the prosecution as the sole source of delay merely for prosecutional convenience.

We turn to the reasons for the delays. The record does not indicate purposeful or deliberately oppressive tactics by the prosecution. It does, however, indicate various substantial reasons for the delay. Part of the delay here can be attributed to the normal time lapses for investigation and preparation on both sides which, of necessity, must occur in every major criminal prosecution to insure the orderly and just administration of criminal cases. Additionally, the record indicates that this was not an ordinary or minor case. Three defendants had to be tried. Each possessed the right under Penn-

sylvania law to be tried independently [2]. Since the witnesses and evidence in all three cases were substantially the same, one of the defendants had to be tried first, another second, and the other third. All three could not proceed simultaneously. Burgess, who had pled guilty, was brought to trial first on August 22, 1966, four months and some days from the date of the crime. As various motions, which required argument and decision, were still pending in relator's case, the Commonwealth proceeded to trial on the second defendant, Dessus, on September 26, 1966. However, the indictment in Dessus' case was quashed, and, on appeal, the Pennsylvania Supreme Court affirmed the trial judge's order on November 15, 1966. Commonwealth v. Dessus, 423 Pa. 177, 224 A.2d 188 (1966). As the same legal infirmities were present in relator's indictment, it appears that a prosecutorial decision to proceed in Stukes' case while the Dessus appeal was pending would not have served the interests of justice. Both Dessus and Stukes were re-indicted in January, 1967. Thereafter, Dessus' trial was brought to a conclusion on April 7, 1967. Relator's trial began on June 6.

■ Considering the nature of relator's case as being one of three separate trials for the same crime, the complexity of the case, the various motions placed on the record by relator for investigative work and continuances, the need for psychiatric evaluations, and hearings, and the crowded state of Philadelphia Common Pleas criminal dockets, it appears that the case against relator was delayed for good and sufficient reasons. It appears to this Court that the trial proceeded to its logical conclusion at a deliberate pace not inconsistent with the orderly expedition of a speedy trial.

Certain of relator's contentions concerning prejudice cannot be accepted. The trial judge, who had the first-hand opportunity to observe relator during his trial, rejected relator's contentions that he was in a dazed or drugged state during the course of the trial. He further found that the heat of any inflammatory publicity subsided by the time relator was brought to trial. Any such publicity he found did not affect the fairness of relator's trial. We shall not disturb these findings. It is true, as the record discloses, that relator suffered from severe anxiety resulting from being incarcerated pending trial. There was, however, no mention in the record of relator's anxious state by relator's counsel prior to April 24, 1967, less than two months prior to the trial. It is also in the record that the testimony of Paula and Natalie Tuchar at trial was not entirely consistent with earlier statements given to the police and their testimony at a Magistrate's hearing. However, they were thoroughly and exhaustively cross-examined at trial and the jury evidently believed them. There is no indication in this record that improper prosecutorial conduct during the proceedings resulted in the inconsistencies.

We are not insensitive to the anxiety suffered by relator while awaiting trial in a capital case. However, considering the record as a whole, considering the length of the delay involved, the procedural chronology of the case, its complexity, and all the attendant circumstances, the Commonwealth acted as expeditiously as could reasonably be expected. Relator all during this time was represented by skilled and experienced counsel who competently and thoroughly explored every avenue of defense available to relator. There was no loss or destruction of evidence in this case as appears in others which would have impaired relator's ability to present an adequate defense. Considering the anxiety suffered by relator and the alleged prejudicial effects of the delays, when balanced against the reasons for the delays, their source, and the rights of public justice, the balance, we believe, is weighed against relator. We therefore, reject relator's contention that he was denied the constitutional right to a speedy trial.

2. Act of March 31, 1860, P.L. 427, §, 40, 19 P.S. § 785.

Relator's contention that the evidence was insufficient to sustain a conviction is without merit. A Federal Court may overturn a State conviction only where there is no evidence to support the verdict. See Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). When the record establishes a basis for the conviction, it is not our province to review the sufficiency of the evidence or to substitute our judgment for that of the jury. United States ex rel. Cunningham v. Maroney, 397 F.2d 724 (3rd Cir. 1968), cert. denied 393 U.S. 1045, 89 S.Ct. 663, 21 L.Ed. 2d 594 (1969). Without more, there is testimony in the record which demonstrates relator's direct participation in the rape of Natalie Tuchar and aiding and abetting his co-defendants during the course of the crimes committed.

The evidence also is sufficient to meet the requirements of the Pennsylvania Felony Murder Rule, Commonwealth v. Batley, 436 Pa. 377, 260 A.2d 793 (1970); Commonwealth v. Melton, 406 Pa. 343, 178 A.2d 728 (1962) cert. denied 371 U.S. 851, 83 S.Ct. 93, 9 L.Ed. 2d 87 (1963).

We find relator's remaining contentions to be without merit. Consequently, the writ will be denied.